NUANCE COMMUNICATIONS, INC.,   )
                               )
          Plaintiff,           )
                               )
     v.                        )     Civil Action No. 17-1484-MN-SRF
                               )
MMODAL LLC, MMODAL IP LLC, LP  )
PARENT, INC. and LEGEND PARENT,)
INC.,                          )
                               )
          Defendants.          )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this patent infringement action is a partial motion to dismiss

for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil

Procedure 12(b)(6), filed by defendants MModal LLC, MModal IP LLC, LP Parent, Inc., and

Legend Parent, Inc. (collectively, "MModal").  (D.I. 20)[1]  For the following reasons, I

recommend that the court grant MModal's motion to dismiss with respect to United States Patent

No. 7,379,946, and deny the motion to dismiss with respect to United States Patent Nos.

6,999,933 and 8,117,034.[2]

### II.   BACKGROUND

#### A.    Parties

Nuance designs and provides voice recognition and transcription technologies for

businesses and individuals around the world, and its products include Dragon Medical,

---

[1] The briefing associated with the instant motion to dismiss is located at D.I. 21, D.I. 28, and D.I. 36.

[2] On September 4, 2018, counsel filed a letter (D.I. 88) informing the court that MModal's motion to dismiss is moot with respect to United States Patent No. 9,564,126, which was dismissed from the action on September 11, 2018 (D.I. 95).

PowerScribe, eScription, EditScript, and Velocity. (D.I. 1 at ¶ 1) Nuance is the owner by assignment of United States Patent Nos. 9,564,126 ("the '126 patent"), 7,379,946 ("the '946 patent"), 6,308,158 ("the '158 patent"), 6,766,295 ("the '295 patent"), 6,999,933 ("the '933 patent"), and 8,117,034 ("the '034 patent"). (*Id.* at ¶¶ 12-17)

Defendants MModal LLC and MModal IP LLC are privately-held limited liability corporations. (*Id.* at ¶¶ 4-5) Defendant LP Parent, Inc. holds 100% of the equity in Legend Parent, Inc., which holds 100% of the equity in MModal Inc. (*Id.* at ¶ 8) MModal Inc. indirectly owns MModal IP LLC, and directly or indirectly owns the remaining affiliates of its parent companies. (*Id.*) Nuance accuses MModal of infringing the '946 patent, the '295 patent, the '933 patent, and the '034 patent (collectively, the "Asserted Patents")[3] by providing products under the M*Modal Fluency and M*MODAL CDI solutions umbrella brands that use voice capture and recognition technology for Computer-Assisted Physician Documentation ("CAPD") and Clinical Documentation Improvement ("CDI"). (*Id.* at ¶ 18) Specifically, Nuance identifies the following allegedly infringing products: Fluency Direct, Fluency for Transcription, Fluency for Imaging, Fluency Flex, Fluency Mobile, CDI Assess, CDI Collaborate, CDI Engage, and reasonably similar products ("the Accused CAPD Products and Services"). (*Id.*)

---

[3] Although the complaint also asserts claims for infringement of the '126 and '158 patents, the parties stipulated to dismiss those patents with prejudice on September 11, 2018. (D.I. 95)

2

## B. Patents-In-Suit

Nuance filed this patent infringement action on October 23, 2017, asserting claims for infringement of the Asserted Patents. (D.I. 1 at ¶ 1) Only the '946, '933, and '034 patents are the subject of MModal's partial motion to dismiss under 35 U.S.C. § 101.[4]

The '946 patent was filed on May 7, 2004 and claims priority to a provisional application filed on March 31, 2004. The '946 patent covers automated speech recognition ("ASR"), and "relates generally to methods and apparatus for categorizing input data in speech recognition systems and classifying the data into predetermined classifications." ('946 patent, col. 1:65-68) The invention of the '946 patent represented improvements over the prior art systems, which were often only able to transcribe, and could not analyze or categorize the transcribed text. (*Id.* at col. 2:10-16) Contrary to prior art systems using natural language processing ("NLP"), the ASR system claimed in the '946 patent does not require complex software. (*Id.* at col. 2:24-26) Claim 1 of the '946 patent recites:

A computer implemented method for generating a report that includes latent information, comprising:

receiving an input data stream;

performing one of normalization, validation, and extraction of the input data stream;

processing the input data stream to identify latent information within the data stream that is required for generation of a particular report, wherein said processing of the input data stream to identify latent information comprises of identifying a relevant portion of the input data stream, bounding the relevant portion of the input data stream, identifying a predetermined class of information, and normalizing the relevant portion of the input data stream;

---

[4] MModal's motion to dismiss also addresses the alleged ineligibility of the '126 patent, but the parties subsequently stipulated to dismiss the '126 patent from the case on September 11, 2018. (D.I. 95)

3

activating a relevant report template based on the said identified latent
information;

populating said template with template-specified data;

processing the template-specified data to generate a report.

('946 patent, col. 16:10-29)

The '933 and '034 patents, which were filed on March 25, 2002 and March 26, 2002,

respectively, are directed to computer-implemented devices and methods for assisting users in

recognizing and correcting errors in a transcription produced from a speech recognition device.

('933 patent, claims 1 & 9; '034 patent, claims 1 & 8) The '933 and '034 patents acknowledge

the existence of devices and methods for assisting users in correcting transcripts in the prior art,

but they identify problems with the prior art methods and devices, including costly delays. ('933

patent, col. 1:16-2:13) The '933 and '034 patents improve the prior art methods and devices by

claiming a synchronous playback mode that does not require the user to manually stop and start

synchronous playback to make corrections. Claim 9 of the '933 patent recites:

A correction method (16) for the correction of incorrect words in text information
(ETI) recognized by a speech recognition device (1) from speech information
(SD), in which the following method steps are executed:

reception of the speech information (SD), the associated recognized text
information (ETI) and link information (LI), which marks the part of speech
information (SD) at which the word was recognized by the speech recognition
device (1) for each word of the recognized text information (ETI);

allowing a synchronous playback mode, in which, during the acoustic playback of
the speech information (SD) the word of the recognized text information (ETI),
which word is marked by the link information (LI) for the speech information
(SD) just played back is marked synchronously, while the word just marked
features the position of an audio cursor (AC);

editing of the incorrect word with a text cursor (TC) according to editing
information (EI) entered by a user, the editing of the incorrect word being

4

possible with the synchronous playback mode activated in the correction device (10).

('933 patent, claim 9) Claim 8 of the '034 patent recites:

A method of assisting in correcting text information recognized by a speech recognition device from speech information, the method comprising:

receiving the speech information, the text information recognized from the speech information, and link information that associates portions of the text information with portions of the speech information from which the portions of the text information were recognized by the speech recognition device;

providing an audio cursor for display during acoustic playback of the speech information, the audio cursor highlighting portions of the text information synchronous with the playback of the speech information according to associations provided by the link information such that, when displayed to the user, the audio cursor highlights the portions of the text information as the associated portions of the speech information are being acoustically played back; and

providing a text cursor for display to facilitate editing the text information, the text cursor indicating a position in the text information where at least one edit will be performed upon receiving editing information entered by the user; and automatically synchronizing the text cursor and the audio cursor, wherein automatically synchronizing the text cursor and the audio cursor comprises automatically positioning the text cursor at a predetermined position relative to a location of the audio cursor and automatically moving the location of the text cursor synchronous with the movement of the audio cursor during the acoustic playback until an editing operation is performed.

('034 patent, claim 8)

## C. Procedural History

In response to the complaint filed on October 23, 2017, MModal filed a partial motion to dismiss on December 11, 2017, alleging that four patents fail to claim patent-eligible subject matter in accordance with 35 U.S.C. § 101. (D.I. 20) On the same date, MModal filed its answer and counterclaims against Nuance. (D.I. 22) Nuance filed a motion to dismiss MModal's counterclaims on January 30, 2018. (D.I. 30) MModal responded by filing an

amended answer and counterclaims on February 20, 2018. (D.I. 41) MModal's amended
counterclaims include two declaratory judgment counterclaims for declarations of non-
infringement and invalidity, as well as two state-law tort counterclaims for abuse of process and
unfair competition. (*Id.*) Nuance filed a motion to dismiss MModal's state law counterclaims on
March 6, 2018. (D.I. 48) On February 28, 2018, MModal Services Ltd. commenced a lawsuit
against Nuance in the Northern District of Georgia, asserting causes of action for infringement of
four patents.

## III. LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all
factual allegations in the complaint and view them in the light most favorable to the plaintiff.
*Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). According to MModal, Nuance's
complaint fails to state a claim because the '946, '933, and '034 patents are ineligible for patent
protection under 35 U.S.C. § 101.

Section 101 provides that patentable subject matter extends to four broad categories,
including "new and useful process[es], machine[s], manufacture, or composition[s] of matter."
35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v.
Chakrabarty*, 447 U.S. 303, 308 (1980). The Supreme Court recognizes three exceptions to the
statutory subject matter eligibility requirements: "laws of nature, physical phenomena, and
abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Supreme Court has held that "[t]he
concepts covered by these exceptions are 'part of the storehouse of knowledge of all men . . .
free to all men and reserved exclusively to none.'" *Id.* at 602 (quoting *Funk Bros. Seed Co. v.
Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). At issue in the present case is the third category
pertaining to abstract ideas, which "embodies the longstanding rule that an idea of itself is not

6

patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (internal quotations omitted).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), the Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. In accordance with the first step of the *Alice* test, the court must determine whether the claims at issue are directed to a patent-ineligible concept. *See id.* If so, the court must turn to the second step, under which the court must identify an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (certain quotation marks omitted). The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

At step one, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."). However, courts must be careful to avoid oversimplifying the claims because, at some level, all inventions "embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. at 71; *see also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). Therefore, the focus of the court's analysis at step one is whether the claim is

7

"directed to" a patent-ineligible concept. *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).

At step two, the Federal Circuit instructs courts to "look to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312 (internal brackets and quotation marks omitted). Under the step two inquiry, the court must consider whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2359). "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted).

The Federal Circuit looks to the claims as well as the specification in performing the "inventive concept" inquiry. *See Affinity Labs of Texas v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface."). "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. In *Bascom*, the Federal Circuit held that "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," but nonetheless determined that the patent adequately alleged an ordered combination of these limitations to be patent-eligible under step two at the pleading stage. *Id.* at 1349.

The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention" under step two. *Alice*, 134 S. Ct. at 2358. "Given the

8

ubiquity of computers ... wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.* (internal citation and quotation marks omitted). For the second step of the *Alice* framework, the machine-or-transformation test may provide a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). A claimed process can be patent-eligible under § 101 consistent with the machine-or-transformation test if it "uses a particular machine or apparatus" and does not "pre-empt[5] uses of the principle that do not also use the specified machine or apparatus in the manner claimed." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2010), *aff'd sub nom.*, *Bilski v. Kappos*, 561 U.S. 593 (2010).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016) (applying regional circuit law to the de novo review of a district court's patent eligibility determination under § 101 on a Rule 12(b)(6) motion to dismiss). However, the Federal Circuit recently emphasized that, "like many legal questions,

---

[5] At both steps one and two of the *Alice* inquiry, the Federal Circuit considers the issue of preemption to determine whether a patent is not directed to a specific invention and instead would monopolize "the basic tools of scientific and technological work," thereby "imped[ing] innovation more than it would tend to promote it" and "thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354; *see also McRO*, 837 F.3d at 1315 (applying the doctrine of preemption and concluding that a claim was patent-eligible at step one); *Bascom*, 827 F.3d at 1350 (applying the doctrine of preemption and concluding that a claim was patent-eligible at step two). "[T]he focus of preemption goes hand-in-hand with the inventive concept requirement." *Jedi Techs., Inc. v. Spark Networks, Inc.*, C.A. No. 16-1055-GMS, 2017 WL 3315279, at *8 n.2 (D. Del. Aug. 3, 2017) (quoting *Tenon & Groove, LLC v. Plusgrade S.E.C.*, C.A. No. 12-1118-GMS, 2015 WL 1133213, at *4 (D. Del. Mar. 11, 2015)). However, "the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

9

there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact[]" that goes beyond what was simply known in the prior art. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). On a motion to dismiss, this question of fact, like all questions of fact, must be resolved in the plaintiff's favor. *Aatrix Software, Inc.*, 882 F.3d at 1128.

## IV.   ANALYSIS

### A.   '946 patent

#### 1.   Step one

In support of its motion to dismiss, MModal contends that the asserted claims of the '946 patent are directed to the abstract idea of identifying, extracting, and inputting information from an input data stream in a report template to fill in and generate a report. (D.I. 21 at 6) According to MModal, the method can be performed by a human, and the use of a computer to perform the task was known in the art. (*Id.*)

In response, Nuance argues that the '946 patent is patent eligible because it presents a technological solution to a problem in the field of automated speech recognition ("ASR") by offering an improvement in the way computer systems process data received from ASR systems. (D.I. 28 at 3-4) Nuance notes that many prior art ASR systems were only capable of transcription and could not analyze or categorize the transcribed text in the manner claimed in the "bounding" and "normalizing" steps of the '946 patent.[6] (*Id.* at 4) While Nuance

---

[6] In support of its position, Nuance refers to a claim amendment made during prosecution of the '946 patent to overcome a prior art rejection under 35 U.S.C.§ 102. (D.I. 28 at 6; Ex. A at 5, 8)

acknowledges that more advanced ASR systems utilized natural language processing ("NLP") to extract useable clinical information, these systems required the use of cumbersome software programs. (*Id.* at 4-5) Consequently, Nuance contends that the '946 patent claims an improved system that conserves processing resources. (*Id.* at 5) Nuance identifies the core features of the improvement as reflected in the "bounding" and "normalizing" steps of the '946 patent, which cannot be performed by a human. (*Id.* at 6-8)

Applying the first step of the *Alice* framework to the asserted claims, the focus of claim 1 of the '946 patent is directed to the abstract idea of receiving data, recognizing words using well-known ASR technology, and storing the data in the appropriate fields of a report template. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016) (holding that computer-implemented methods directed at collecting, analyzing, and storing data are patent ineligible abstract ideas). The preamble of claim 1 recites "[a] computer implemented method for generating a report that includes latent information." ('946 patent, col. 16:10-11) However, computerized methods of transforming dictated speech into written text for purposes of generating medical reports were known in the art, and NLP software was capable of extracting certain clinical information from reports. (*Id.*, col. 2:10-20) The specification acknowledges that these requirements amount to collecting, analyzing, storing, and presenting data. ('946 patent, col. 4:41-46) (describing "a system and method for collecting, classifying, and

However, the examiner's allowance of the amendment in assessing the novelty of the invention under § 102 does not compel a conclusion that an abstract idea is patent eligible. *See Kaavo Inc. v. Cognizant Tech. Solutions Corp.*, C.A. Nos. 14-1192-LPS-CJB, 14-1193-LPS-CJB, 2016 WL 1268308, at \*3 (D. Del. Mar. 31, 2016) (citing *IpLearn v. K12 Inc.*, 76 F. Supp. 3d 525, 534 (D. Del. 2014) ("A new idea, i.e., one that is non-anticipated and non-obvious, does not, however, make an abstract idea patent eligible.")); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012) (rejecting efforts to "substitute §§ 102, 103, and 112 inquiries for the better established inquiry under § 101.").

11

normalizing input data by combining traditional data input methods, natural language processing

techniques, and providing templates to users associated with a predetermined classification

scheme based on the input normalized data"). The Federal Circuit has held that such methods

are patent-ineligible abstract ideas:

> [C]ollecting information, including when limited to particular content (which does
> not change its character as information), [is] within the realm of abstract ideas. In
> a similar vein . . . analyzing information by steps people go through in their
> minds, or by mathematical algorithms, without more, [are] essentially mental
> processes within the abstract-idea category. And . . . merely presenting the results
> of abstract processes of collecting and analyzing information, without more (such
> as identifying a particular tool for presentation), is abstract as an ancillary part of
> such collection and analysis.

*Elec. Power Grp., LLC v. Alstom, S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016) (citations

omitted).

Nuance does not suggest that the majority of the claimed elements represent an

improvement to computer functionality. Specifically, Nuance does not challenge MModal's

characterization of steps such as receiving an input data stream, identifying a relevant portion of

the input data stream, activating a relevant report template based on the identified latent

information, populating the template with template-specified data, and processing the template-

specified data to generate a report. ('946 patent, col. 16:12-29) The parties' dispute centers on

whether the "bounding" and "normalizing" steps of claim 1 constitute an improvement to

computer functionality sufficient to remove the '946 patent from the realm of abstract ideas.

However, the specification of the '946 patent does not support Nuance's assertion that the

"normalizing" step of independent claim 1 represents an improvement to technical processes.

(D.I. 28 at 7) Instead, the specification identifies "[e]xemplary methods and systems for

performing this normalization" that were known in the art, including U.S. Provisional

12

Application No. 60/547,797, and observes that "[o]ther methods of normalization may be used to perform normalization step 515, as will be appreciated by one skilled in the art." ('946 patent, col. 13:37-44)

In addition, the specification describes the claimed "normalizing" step using functional language, without identifying how the claimed function is performed. The "normalizing" limitation "permit[s] the system to put input data in a more easily recognizable form for comparison with various databases," but neither the claims nor the specification explains how this goal is achieved. ('946 patent, col. 13:44-47) The same is true of the "bounding" limitation, which is described in purely functional terms as a process to "provide boundaries around the relevant data (i.e., the process may bound the relevant data)." ('946 patent, col. 8:23-25) Neither the claims nor the specification explains how the claimed computer components achieve the requisite "bounding" in a non-abstract way. The Federal Circuit has clarified that allowing a patentee to claim a result without identifying the means of achieving the result "would have impermissible preemptive effects." *Epic IP*, 2018 WL 6107029, at \*4 (citing *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018) (finding patent-ineligible a claim reciting a "broad, result-oriented" structure encompassing all solutions "[i]nstead of claiming a solution for producing [a] result.")); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (concluding that result-based functional language is insufficient to confer patent eligibility); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("[T]he claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more.").

13

The specification explains that the invention improves the functioning of a computer by eliminating the need for complex, inefficient software or manual data input to process specialized medical information. ('946 patent, col. 2:20-39) The invention is directed to "lightweight natural language processing," which differs from prior art NLP systems because

> the processor need not determine what type of a term or phrase a word or sequence of words is and need not bound the word or sequence of words, but rather may rely on one or more templates to bound the word or sequence of words and determine what type of a term or phrase a word or sequence of words is.

('946 patent, col. 7:23-28) Again, the '946 patent does not specify how the claimed computer components achieve this function. *Cf. Enfish*, 822 F.3d at 1338-39 (holding that software patents satisfy *Alice* step one when they are "directed to a specific implementation of a solution to a problem in the software arts."). The focus of the claims in this case is not on a specific improved structure to enhance computer functionality, but instead is directed to an abstract end-result. *RecogniCorp*, 855 F.3d at 1326.

Moreover, the claims of the '946 patent identify only generic computer components, and the specification emphasizes the generic nature of the computer components required to implement the invention. *See Elec. Power Grp.*, 830 F.3d at 1355 (finding claims patent ineligible where they "merely call for performance of the claimed information collection, analysis, and display functions on a set of generic computer components and display devices"). The specification explains that "[t]he specific form of input devices 110, 111 are not critical," and the processing device "can include a processor 125 and a memory 126." ('946 patent, col. 6:55-59) In this regard, computers are invoked as a tool in claim 1 of the '946 patent, with no identification of a specific improvement in the capability of the claimed computing devices. *See Core Wireless*, 880 F.3d at 1361-62.

14

The step one analysis of claim 1 of the '946 patent applies equally to the five asserted dependent claims. The dependent claims contain field of use or data type limitations, which do not constitute an improvement to technology that would render the claims patent eligible. *See Elec. Power Grp., LLC*, 830 F.3d at 1355 ("[S]electing information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes."). For this reason, the dependent claims also articulate an abstract idea at step one of the *Alice* inquiry.

Several recent cases from the Federal Circuit are factually analogous and support the court's conclusion that the asserted claims of the '946 patent are directed to an abstract idea, with no improvement to the functionality of a computer. The claimed identification, extraction, and inputting of information from an input data stream into a report template in the '946 patent is comparable to the parsing, comparing, storing, and editing of data at issue in *Berkheimer*, which claimed a method of archiving an item in a computer processing system. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1366 (Fed. Cir. 2018). In *Electric Power Group*, the Federal Circuit concluded that the claims were directed to the abstract idea of gathering and analyzing information, and displaying the results. *Electric Power Grp. v. Alstom*, 830 F.3d 1350, 1354 (Fed. Cir. 2016). Similar to the claims at issue in the present case, the representative claim in *Electric Power Group* recited a method of receiving data streams from multiple sources, detecting and analyzing events in real-time, displaying event analysis results, accumulating and updating measurements from the data streams, and deriving a composite indicator of reliability from the collected data. *Id.* at 1351-52.

Most recently, in *SAP America, Inc. v. InvestPic, LLC*, the Federal Circuit held that claims directed to systems and methods for performing certain statistical analyses of investment

15

information were ineligible under § 101 "because their innovation is an innovation in ineligible subject matter. . . . No matter how much of an advance in the . . . field the claims recite, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm." 898 F.3d 1161, 1163 (Fed. Cir. 2018). Like the asserted claims of the '946 patent, the claims at issue focused on selecting information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis. *Id.* at 1167. The Federal Circuit observed that the claims did not identify an improved computer or network. "[I]ndeed, the specification makes clear that off-the-shelf computer technology is usable to carry out the analysis." *Id.* at 1168.

Contrary to Nuance's argument, the facts of this case are distinguishable from the circumstances before the Federal Circuit in *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299 (Fed. Cir. 2018). In *Finjan*, the Federal Circuit upheld the patent eligibility of claims directed to a behavior-based virus scanning method that "employ[ed] a new kind of file that enables a computer security system to do things it could not do before," such as accumulating and utilizing behavior-based information about potential threats. 879 F.3d 1299, 1304-05 (Fed. Cir. 2018). The asserted claims in *Finjan* recited details describing a new kind of computer file and specific steps to accomplish the desired result. *Id.* at 1303-05. In contrast to each of the claimed advancements in *Finjan*, the '946 patent claims and specification do not identify any improvements to the functionality of the computer itself, nor do they disclose an inventive means of achieving the desired result.

In view of the foregoing analysis, I recommend that the court conclude the asserted claims of the '946 patent, when considered as a whole, are directed to the abstract idea of

16

receiving data, recognizing words using well-known ASR technology, and storing the data in the appropriate fields of a report template.

### 2. Step two

According to MModal, the other features of the claims do not add an inventive concept, and instead apply the abstract idea on a generic computer with basic processing functions. (D.I. 21 at 7-8) MModal alleges that the field of use and data type limitations of the dependent claims are insufficient to render the claims patent eligible. (*Id.* at 8)

In response, Nuance rejects the notion that the claim limitations recite a conventional means of processing an input data stream. (D.I. 28 at 8-9) Reverting to the step one analysis, Nuance contends that the specification's discussion of improvements over the prior art systems confirm that the claims are not abstract. (*Id.* at 9) Nuance does not articulate a specific inventive concept, and instead highlights MModal's purported failure to address the "bounding" and "normalizing" limitations. (*Id.* at 8-9)

I recommend that the court conclude the asserted claims of the '946 patent are not directed to an inventive concept. The Federal Circuit has held that claim language which "does not provide any specific showing of what is inventive about the identifier or about the technology used to generate and process it" does not qualify as an inventive concept. *Secured Mail Sols. LLC v. Wilde, Inc.*, 873 F.3d 905, 912 (Fed. Cir. 2017). The parties do not dispute that many of the claimed steps of the '946 patent, such as receiving an input data stream, identifying a relevant portion of the input data stream, activating a relevant report template based on the identified latent information, populating the template with template-specified data, and processing the template-specified data to generate a report, are routine steps. ('946 patent, col. 16:12-29) Because Nuance argues that the "bounding" and "normalizing" requirements of the

17

'946 patent are inventive, the court focuses on these claim elements. *See Secured Mail*, 873 F.3d at 911 (noting that "[t]he district court is correct to search for an inventive concept in precisely the factors that Secured Mail argues comprises the inventive concept.").

The claim language of the '946 patent requires that the relevant portion of the input data stream must be bounded and normalized. ('946 patent, col. 16:14-23) The claim language does not explain how the bounding and normalizing steps are performed, nor does it specify what is inventive about these particular steps. The cursory description of these steps in the specification suggests that "normalizing" and "bounding" were understood in the art. For example, the specification describes "provid[ing] boundaries around the relevant data (i.e., the process may bound the relevant data). (*Id.*, col. 8:23-25) Moreover, the specification identifies "[e]xemplary methods and systems for performing this normalization" that were known in the art, including U.S. Provisional Application No. 60/547,797, and observes that "[o]ther methods of normalization may be used to perform normalization step 515, as will be appreciated by one skilled in the art." ('946 patent, col. 13:37-44)

In addition, the claims do not identify how the claimed functions of "bounding" and "normalizing" are performed. The specification explains that the "normalizing" limitation "permit[s] the system to put input data in a more easily recognizable form for comparison with various databases," but the claims do not identify how this goal is achieved. ('946 patent, col. 13:44-47) The same is true of the "bounding" limitation. (*Id.*, col. 8:23-25) The asserted claims of the '946 patent do not identify with specificity how these steps lead to the efficiencies described in the specification as resulting from a method of lightweight natural language processing. (*Id.*, col. 7:17-28)

18

Viewing the claim elements of the '946 patent as an ordered combination, the same result applies. Unlike the circumstances in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, there is no evidence that the generic computer components recited in the asserted claims operate in an unconventional manner. 841 F.3d 1288, 1300-01 (Fed. Cir. 2016) (concluding that generic network devices working together in a distributed manner were unconventional and inventive). The asserted claims of the '946 patent, which do not expressly refer to automated speech recognition, fail to identify a specific inventive concept.

The facts presently before the court are distinguishable from the circumstances before the Federal Circuit in *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016). In *Bascom*, the Federal Circuit concluded that the claims were directed to an abstract idea at step one of the *Alice* inquiry because the claim limitations recited generic computer components that were not inventive in isolation. *Id.* at 1350. However, at step two of the inquiry, the Federal Circuit concluded that the ordered combination of the limitations set forth an inventive concept involving the "installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." *Id.* The Federal Circuit concluded that the claims did not preempt all ways of filtering content on the Internet because they identified a specific arrangement of elements representing a technical improvement over the prior art. *Id.* In contrast, the facts of the instant case do not avoid the risk of preemption because the asserted claims of the '946 patent do not expressly restrict the invention to ASR computer systems. Regardless, "[a] claim does not contain an inventive concept simply because it does not preempt the field." *IPA Technologies, Inc. v. Amazon.com, Inc.*, 307 F. Supp. 3d 356, 373 (D. Del. 2018).

19

For the foregoing reasons, I recommend that the court grant MModal's motion to dismiss with respect to the '946 patent.

## B. '933 and '034 patents

### 1. Step one

MModal next alleges that the '933 and '034 patents are directed to the widely known, patent-ineligible abstract idea of correcting errors in a transcribed text while listening to the audio recording of the dictation. (D.I. 21 at 12) According to MModal, the claimed inventions comprise a computer implementation of a task conventionally performed by humans. (*Id.*)

In response, Nuance contends that the '933 and '034 patents resolve specific problems in the prior art methods of correcting transcripts by eliminating the need to stop the synchronous playback mode to make corrections in the text of the transcription. (D.I. 28 at 10-12) Nuance alleges that these claimed improvements, which are particularly rooted in computer software technology, increase efficiency by reducing the number of steps necessary to make a correction. (*Id.* at 12-13) According to Nuance, preemption is not a concern in the instant case because the claims of the '933 and '034 patents do not foreclose all methods of correcting errors in a transcribed text while listening to a dictation recording. (*Id.* at 13-14)

As a preliminary matter, the court notes that MModal identifies independent claim 9 of the '933 patent, and independent claim 8 of the '034 patent, as representative of the remaining asserted claims because all the claims are substantially similar and linked to the same allegedly abstract idea. (D.I. 21 at 11) Nuance does not dispute MModal's position on this point. (D.I. 28 at 11) (addressing independent claim 9 of the '933 patent and independent claim 8 of the '034 patent as representative claims).

20

Applying the first step of the *Alice* framework to the asserted claims, claim 9 of the '933 patent and claim 8 of the '034 patent are not directed to an abstract idea, but instead recite solutions to problems rooted in automated speech recognition technology. *See Epic IP*, 2018 WL 6201582, at \*8 (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)). Specifically, the '933 and '034 patents claim the synchronization of text and audio cursors while the speech recognition device remains in synchronous playback mode. ('933 patent, col. 10:9-20; '034 patent, col. 9:52-10:6) The specification indicates that the remaining claim limitations were known in the art. ('933 patent, col. 1:29-39) However, the representative claims, when considered as a whole and in light of the specification, are directed to an improved user interface for editing dictation text using a speech recognition device. The claimed methods provide a solution to technological problems in prior art speech recognition devices. The specification indicates that,

> [i]f during the synchronous playback mode the corrector recognizes an incorrect word in the text information, then he interrupts or deactivates respectively, the synchronous playback mode, positions a text cursor at the incorrect word by means of the keyboard of the computer and edits it. Then he reactivates the synchronous playback mode, whereupon the playback of the speech information is continued from the corrected word onwards.

('933 patent, col. 1:51-58) The specification explains that this process was time-consuming, and these inefficiencies negatively impacted the payment received by the transcriber. (*Id.*, col. 1:59-2:13) To address these problems, the claimed inventions provide a method of editing text while synchronous playback mode is activated, using an audio cursor synchronized with a text cursor that can be positioned at an incorrect word. (*Id.*, col. 3:29-39) In this manner, the user may edit the text while the audio continues to play, and the user may synchronize the audio and text

cursors to eliminate reliance on the arrow keys or mouse for navigation during the editing process. (*Id.*, col. 7:5-44)

The representative claims are directed to the specific technological modification of synchronized audio and text cursors which allow a user to edit text while synchronous playback mode is activated. ('933 patent, col. 9:44-10:20; '034 patent, col. 9:43-10:6) Representative claim 9 of the '933 patent recites this improvement, requiring the editing of an incorrect word with a text cursor while the synchronous playback mode is activated in the correction device and the audio cursor follows the acoustic playback of the speech information. ('933 patent, col. 10:9-20) Similarly, representative claim 8 of the '034 patent recites the specific implementation of the method for editing the text by requiring an audio cursor for display during acoustic playback to highlight portions of the text information as the audio plays. ('034 patent, col. 9:52-60) Claim 8 also recites a text cursor to facilitate editing the text information, indicating the position in the text information where an edit will be made by the user. (*Id.*, col. 9:61-65) The claim requires synchronization of the text cursor and the audio cursor by "automatically positioning the text cursor at a predetermined position relative to a location of the audio cursor and automatically moving the location of the text cursor synchronous with the movement of the audio cursor during the acoustic playback until an editing operation is performed." (*Id.*, col. 9:66-10:6) Compared to the prior art, which undermined the efficiency of the speech recognition device by requiring the user to stop the synchronous playback mode each time an edit was made, and which required a user to navigate the text cursor manually using multiple keystrokes, the interface set forth in the representative claims of the '933 and '034 patents set forth significant improvements to the efficiency of the speech recognition device.

22

Claim 9 of the '933 patent and claim 8 of the '034 patent are comparable to the challenged Tab Patents at issue in the Federal Circuit's recent decision in *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999 (Fed. Cir. 2018). There, the Federal Circuit held that a claim directed to a specific method for navigating three-dimensional electronic spreadsheets was not abstract because the claimed method provided a specific solution to the problem users faced of searching through complex menu systems to locate appropriate commands. *Data Engine Techs.*, 906 F.3d at 1007-08. The Federal Circuit determined that the user-friendly interface increased functionality by facilitating the navigation of three-dimensional spreadsheets. *Id.* at 1008. Similarly, the representative claims in the present action recite specific methods for navigating and editing dictation transcripts more efficiently by eliminating the need to stop the acoustic playback each time a correction is made. The synchronization of the audio and text cursors permit the user to quickly correct the transcript and move to the current location of the acoustic playback without time-consuming navigation keystrokes. Like the Tab Patents at issue in *Data Engine Technologies*, the representative claims of the '933 and '034 patents improve the functionality of speech recognition devices by facilitating navigation of the text information.

The representative claims at issue in the present case are also comparable to the circumstances before the Federal Circuit in *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356 (Fed. Cir. 2018). In *Core Wireless*, the Federal Circuit concluded that the limitations were patent-eligible because they "disclose[d] a specific manner of displaying a limited set of information to the user, rather than using conventional user interface methods." *Id.* at 1363. The claimed invention in *Core Wireless* provided "improved display interfaces, particularly for devices with small screens," which resolved problems with prior art interfaces that "required users to drill down through many layers to get to desired data or functionality."

23

*Id.* at 1359, 1363. As in *Core Wireless*, the representative claims in the '933 and '034 patents are directed to "a particular manner of . . . presenting information" in a speech recognition device. *Id.* at 1362.

The asserted dependent claims of the '933 and '034 patents further limit the claimed method and are patent eligible for the reasons set forth above. *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 n.1 (Fed. Cir. 2018) ("[W]hether dependent claims . . . are directed to an abstract idea at step one depends upon whether independent claim 1 is directed to an abstract idea."); *see also Intellectual Ventures I, LLC v. Motorola Mobility LLC*, 81 F. Supp. 3d 356, 369 (D. Del. 2015) (concluding that dependent claims were patent-eligible where they provided additional specificity to the independent claim, which was not directed to an abstract idea).

### 2. Step two

Having determined that the asserted claims of the '933 patent and '034 patent are not directed to an abstract idea at step one of the *Alice* inquiry, I recommend that the court decline to reach step two of the analysis. *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (noting that, if the claims are not directed to an abstract idea at step one, "the claims satisfy § 101 and [the court] need not proceed to the second step.").

## V. CONCLUSION

For the foregoing reasons, I recommend that the court grant MModal's motion to dismiss with respect to the '946 patent, and deny the motion with respect to the '933 patent and the '034 patent. (D.I. 20)

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation.

Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: December 14, 2018

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE