**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| NUANCE COMMUNICATIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) C.A. No. 17-1484-MN |
| v. | ) |
| | ) **PUBLIC VERSION** |
| 3M HEALTH INFORMATION SYSTEMS, | ) |
| INC. and MMODAL LLC, | ) |
| | ) |
| Defendants. | ) |

**UNOPPOSED MOTION TO REDACT A LIMITED PORTION OF THE
SEPTEMBER 8, 2021 HEARING TRANSCRIPT**

1.      Defendants 3M Health Information Systems, Inc. and MModal LLC (collectively, "MModal"), by and through their attorneys, pursuant to Rule 5.2 of the Federal Rules of Civil Procedure, hereby move for an order redacting certain limited information from the transcript of the Court's September 8, 2021 motion to strike hearing. Upon the conclusion of the hearing, the transcript was sealed.

2.      After reviewing the transcript, MModal proposes that certain portions of the transcript be redacted because they refer to confidential business and financial information revealed during the course of the teleconference: information that was produced pursuant to the Stipulated Protective Order entered in this action (D.I. 52) and designated Highly Confidential – Outside Counsel Eyes Only under the Stipulated Protective Order.

3.      MModal's proposed redactions are highlighted in a copy of the transcript attached as Exhibit A, and a redacted public copy of the transcript to be filed is also attached as Exhibit B.

4.      "Every court has inherent supervisory power, and the Third Circuit has held that courts may exercise that power to deny access to judicial records." *Mosaid Techs. Inc. v.*

1

*LSI Corp.*, 878 F. Supp. 2d 503, 507 (D. Del. 2012) (citation omitted). Redaction of a judicial transcript is appropriate where "good cause" is demonstrated, *see* Fed. R. Civ. P. 26(c)(1), and good cause exists where the source of "business information . . . might harm a litigant's competitive standing." *See Littlejohn v. BIC Corp.*, 851 F.2d 673, 677-78 (3d Cir. 1988); *Mosaid Techs. Inc.*, 878 F. Supp. 2d at 507-08 (citing *Joint Stock Soc'y v. UDV N. Am., Inc.*, 104 F. Supp. 2d 390, 395 (D. Del. 2000)); *see also In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019).

5.      To establish "good cause," the party seeking redaction must show that the "disclosure will work a clearly defined and serious injury to [that party]." *In re Cendent Corp.*, 260 F.3d 183, 194 (3d Cir. 2001). The court's assessment of whether good cause exists "generally involves a balancing process, in which courts weigh the harm of disclosing information against the importance of disclosure to the public." *Mosaid Techs. Inc.*, 878 F. Supp. 2d at 508 (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787 (3d Cir. 1994)). The party seeking to seal part of the judicial record "must show that 'the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.'" *In re Avandia*, 924 F.3d at 677-78 (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)).

6.      Here, the proposed redactions are limited to business and financial information concerning the names of MModal's prospective customers and the revenue for MModal's products, the disclosure of which would harm MModal's competitive standing. For example, disclosure would enable competitors to take advantage of this information to counter MModal's marketing and sales strategies. Such sensitive commercial and financial material is "the kind of information that courts will protect and that disclosure will work a clearly defined

and serious injury to the party seeking closure." *See In re Avandia*, 924 F.3d at 672; *see also id.* at 679 ("[C]ourts may permissibly seal judicial records 'where they are sources of business information that might harm a litigant's competitive standing.'" (quoting *Republic of the Phil. v. Westinghouse Elec. Corp.*, 949 F.2d 653, 662 (3d Cir. 1991)).

7.     As such, MModal respectfully submits that good cause exists for the redaction of those portions of the transcript containing information produced as Highly Confidential – Outside Counsel Eyes Only under the Stipulated Protective Order, and requests that the Court grant this motion.

8.     Pursuant to D. Del. LR 7.1.1, the parties conferred and Plaintiff Nuance Communications, Inc. does not oppose MModal's proposed redactions.

OF COUNSEL:

David K. Callahan
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel: (312) 876-7700

Tara D. Elliott
Kevin C. Wheeler
Gabriel K. Bell
Alan M. Billharz
LATHAM & WATKINS LLP
555 Eleventh Street, Suite 1000
Washington, D.C. 20004
Tel.: (202) 637-2200

Stephen D. O'Donohue
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Tel.: (212) 906-1200

Meiran Yin
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Tel.: (650) 328-4600

Dated: October 5, 2021

*/s/ Nicole K. Pedi*
Kelly E. Farnan (#4395)
Nicole K. Pedi (#6236)
Valerie A. Caras (#6608)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Tel: (302) 651-7700
farnan@rlf.com
pedi@rlf.com
caras@rlf.com

*Attorneys for Defendants 3M Health*
*Information Systems Inc. and MModal LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2021, a true and correct copy of the foregoing document

was served upon the following attorneys of record by electronic mail:

David E. Moore
Bindu A. Palapura
Stephanie E. O'Byrne
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801

David J. Lender
Anish R. Desai
Sudip Kundu
WEIL GOTSHAL &MANGES LLP
767 Fifth Avenue
New York, NY 10153

Stephen Bosco
WEIL GOTSHAL &MANGES, LLP
2001 M Street, NW Suite 600
Washington, DC 20036

Amanda Branch
WEIL GOTSHAL &MANGES, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065

David Greenbaum
Nuance Communications, Inc.
1111 Macarthur Blvd.
Mahwah, NJ 07430

*/s/ Nicole K. Pedi*
Nicole K. Pedi (#6236)
Pedi@rlf.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NUANCE COMMUNICATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 17-1484-MN |
| v. | ) | |
| | ) | |
| 3M HEALTH INFORMATION SYSTEMS, | ) | |
| INC. and MMODAL LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER GRANTING UNOPPOSED MOTION TO REDACT
A LIMITED PORTION OF THE SEPTEMBER 8, 2021 HEARING TRANSCRIPT**

WHEREAS, Defendants 3M Health Information Systems, Inc. and MModal LLC, having moved to seal a limited portion of the September 8, 2021 hearing transcript (the "Transcript") containing information deemed highly confidential (the "Motion"), there being no opposition, and good cause having been shown;

IT IS HEREBY ORDERED this ___ day of _____, 2021, that the Motion is GRANTED.  The redacted version of the Transcript attached as Exhibit B to the Motion shall be filed as the public version.

_____
The Honorable Maryellen Noreika
United States District Judge

# Exhibit A

**Redacted in its Entirety**

# Exhibit B

```
1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3

        NUANCE COMMUNICATIONS, INC.,    )
4                                       )
        --------------------Plaintiff, )
5                                       )Case No.
                 vs.                    )17-CV-01484-MN
6                                       )
        MMODAL LLC,                     )
7                                       )
        --------------------Defendant. )
8

9              TRANSCRIPT OF MOTION TO STRIKE

10

11              MOTION TO STRIKE had before the

12      Honorable Maryellen Noreika, U.S.D.C.J., via

13      teleconference on the 8th of September, 2021.

14

15                    APPEARANCES

16           POTTER ANDERSON & CORROON, LLP
                 BY: BINDU PALAPURA, ESQ.
17               ANISH R. DESAI, ESQ.
                 DAVID E. MOORE, ESQ.
18
                         -and-
19
             WEIL GOTSHAL & MANGES LLP
20               BY: ANISH R. DESAI, ESQ.
                 DAVID LENDER, ESQ.
21               STEPHEN BOSCO, ESQ

22                             Counsel for Plaintiff

23

24

25
```

1          (Appearances continued.)

2

3               RICHARDS, LAYTON & FINGER, P.A.
                    BY: KELLY E. FARNAN, ESQ.

4                         -and-

5          LATHAM & WATKINS LLP
                    BY: DAVID K. CALLAHAN, ESQ.

6                   TARA D. ELLIOTT, ESQ.
                    KEVIN C. WHEELER, ESQ.

7                   STEPHEN D. O'DONOHUE, ESQ.

8                        Counsel for Defendant MModal

9

          ALSO PRESENT:

10

11              Sandra Nowak and Brian Bender

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good afternoon, counsel.

2     Who's there, please?

3          MS. PALAPURA:  Good afternoon, Your

4     Honor.  This is Bindu Palapura from Potter

5     Anderson on behalf of Plaintiff Nuance, and

6     with me today is my colleague David Moore from

7     Potter Anderson, and also with me from Weil

8     Gotshal and Manges is David Lender, Anish

9     Desai, and Stephen Bosco.

10         THE COURT:  All right.  Good

11    afternoon to all of you.

12         MS. FARNAN:  Good afternoon, Your

13    Honor.  It's Kelly Farnan from Richards Layton

14    and Finger on behalf of MModal.  I'm joined by

15    my co-counsel from Latham and Watkins David

16    Callahan, Tara Elliott, Kevin Wheeler, Stephen

17    O'Donohue.  We also have a couple of

18    representatives from 3M on the line, Sandra

19    Nowak and Brian Bender.

20         THE COURT:  All right.  Good

21    afternoon to all of you as well.

22         So I wanted to talk with you all about

23    the motion to strike, but we have reviewed all

24    of the Daubert and summary judgment papers, and

25    I'm pretty sure I know what we want to do with

 1          most of those, but there were a couple of

 2          questions that we had, so that's why we asked

 3          you all to get on the phone and be prepared to

 4          discuss those.

 5              I think I want to go through those first,

 6          if you don't mind.  There's one that I think I

 7          can just rule on, and that is Plaintiff's

 8          Daubert motion on the private conversations

 9          that the expert had, DI 397.  For that one, I'm

10          going to deny that and instruct the parties to

11          work out a time for a deposition of that -- the

12          person with whom the expert had private

13          conversation.

14              Then we have the Daubert -- Plaintiff's

15          Daubert on Dr. Stern, and there, as the motion

16          relates to the output device, it seemed like

17          that was mooted by the parties' agreement that

18          it's a factual issue and not one of claim

19          construction, where we had many discussions

20          about this with respect to -- I don't remember

21          whose motion it was, but it was a factual issue

22          as to whether the output device is part of the

23          speech recognition system or not, and so in

24          light of that, I assume that -- that applies

25          here; is that correct?

1          MR. DESAI:  Your Honor, this is Anish

2     Desai for Nuance.

3          I believe there is a difference, and, if

4     you allow me, I can explain it.  The issue is

5     in May at the teleconference, the issue that we

6     said was an issue of fact is whether or not an

7     output device of an accused product recognizes

8     speech.  That's an issue of fact.  For example,

9     MModal has accused products, and they say

10    here's an output display device, and whether or

11    not that recognizes speech is a question of

12    fact for the jury.  That remains to be the

13    case.

14          But that is not the same issue as the

15    Daubert and the reason is Dr. Stern's opinions

16    that we're seeking to exclude are based on him

17    interpreting the claims to require that a voice

18    input device be remote from any output device,

19    and he says that explicitly in his report

20    multiple times.  So I'll give you four

21    examples.  Paragraph 95 of his rebuttal report,

22    which was attached as Exhibit 1 to our motion,

23    he says, quote, "First, under the Court's

24    construction, as agreed on by the parties, the

25    asserted claims require the voice input device

1          and any output device of the claimed speech

2          recognition system to be at different

3          locations." He's talking about the scope of the

4          claim there.

5                At paragraph 97, he says, "In my opinion,

6          none of the accused products infringe claim 1

7          because claim 1 requires the input voice device

8          and any output device to be at a different

9          location.  He says the same thing in paragraph

10         102 and 105.  It's absolutely clear that he's

11         talking about the scope of the claim and not --

12                THE COURT:  Stop.  Stop.  Why when we

13         were discussing this -- the issue was is the

14         output device part of the speech recognition

15         system, and I thought the issue was it doesn't

16         recognize speech, so the plaintiff said it

17         doesn't recognize speech.  It's not part of the

18         speech recognition system, and Defendant said

19         it is part of the speech recognition system.

20         Isn't that what we talked before?

21                MR. DESAI:  What we talked about

22         before was the Court's construction of speech

23         recognition system is the device or devices

24         that recognize --

25                THE COURT:  That recognize speech;

1    right.  And the issue was is the output device

2    part of that, and as I understood it, it was an

3    issue of fact because I begged people to tell

4    me the it was a claim construction issue, and I

5    got no from both sides.  So I can't believe

6    that you would not be suggesting that this is a

7    claim construction issue, so that's why I am

8    trying to make sure I understand what's going

9    on.

10        The issue then was -- the issue then was

11   is the output device part of the speech

12   recognition system.  You said factual issue; it

13   is not.  Defendant said factual issue; it is.

14   And why is Dr. Stern, in what you're

15   complaining, about saying anything different?

16        MR. DESAI:  Because the difference is

17   Dr. Stern is not offering any opinion that the

18   output device of the accused product recognizes

19   speech.  He is never offering that opinion.

20   His opinion there is that the output device

21   receives and displays the recognized speech,

22   not that it is recognizing speech, and the

23   paragraphs we're seeking to exclude are

24   paragraphs that are talking about how the claim

25   should be construed.  If Dr. -- I still stand

1      by the position that whether or not a

2      particular device in an accused product

3      recognizes speech is an issue of fact.  That is

4      exactly the case.  Okay.  But there's a

5      difference between that and talking about what

6      the claim requires and doesn't require.

7           For example, Dr. Stern says that the

8      claim requires that the server be blue.  That's

9      an issue of claim construction, and, in fact,

10     it's improper opinion because there's no claim

11     construction in this case that says the server

12     is blue and there's nothing in the claim that

13     says the server is blue.  Same for his

14     opinion --

15          THE COURT:  Stop talking.  Let me

16     hear from Mr. Callahan or whomever is going to

17     deal with this.

18          MR. WHEELER:  Your Honor --

19          MR. CALLAHAN:  Mr. Wheeler is going

20     to handle it for us.  Sorry, Your Honor.  It's

21     Dave Callahan speaking.  Kevin Wheeler will

22     handle this for MModal, Your Honor.

23          THE COURT:  All right.  Thank you.

24     Mr. Wheeler.

25          MR. WHEELER:  Good afternoon, Your

1      Honor.  I'm also surprised that hear that

2      Nuance is arguing that this is a claim

3      construction issue because our position is the

4      same as Your Honor's, that this was already

5      resolved and the reason why MModal's motion for

6      the summary judgment was denied, and it was

7      clear as day as to what Nuance's position was

8      then:  Not a claim construction issue.

9           And I'll just -- just so we're all on the

10     same page, I will read from Your Honor's ruling

11     from the second Markman hearing, and this is

12     Docket Number 503 page 35 lines 10 through 22.

13          "First, MModal's motion for summary

14     judgment of no infringement based on the

15     location of the output device in its accused

16     products.  That's Docket Number 390.  We talked

17     about that on our last call when we had a sort

18     of impromptu argument to help us figure out if

19     the issue was a claim construction issue we

20     needed to address or an infringement issue.

21     Both sides told me that the dispute did not

22     present a claim construction issue.  The

23     dispute is factual:  Whether MModal's output

24     device is remote from the rest of the speech

25     recognition system pursuant to the agreed-upon

1      definition of "speech recognition system."  And

2      for that, there appears to be expert testimony

3      on both sides of the issue, so there are

4      factual disputes, and I will deny the motion."

5          We submit that Nuance's motion should be

6      denied for the very same reason.  They can't

7      say it's not claim construction for purposes of

8      the flip side of this issue.

9              THE COURT:  I get that.  I guess my

10     question is, is what about the part -- I mean,

11     where -- it seems, in Dr. Stern's opinion,

12     where he's saying -- if he's saying claim 1

13     requires something, that seems like it's

14     getting closer to claim construction.  What

15     if -- what if Dr. Stern can't say the claim

16     requires it but that -- that the claim as

17     construed says the input must be remote from

18     the rest of the speech recognition system.

19     Here, the output is part of the speech

20     recognition system, and it is -- and,

21     therefore, there is no infringement.

22         Like, where it's getting close to the

23     line for me in his report, not so much what I

24     think we've all argued he's going to say, but

25     when he says "the claim requires," why is

1       that -- that seems like it was pushing on him

2       getting to claim construction, whereas I'm fine

3       with him saying it has to be remote from the

4       rest of the speech recognition system.  The

5       output is not -- is part of the speech

6       recognition system; ergo, it's not remote from

7       it and there's no infringement.

8             MR. WHEELER:  Your Honor, to be

9       clear, Dr. Stern is not saying the claims

10      require an output display.  He is saying what

11      you just articulated, that if there is a

12      display, it is part of the speech recognition

13      system and must be remote.  So I'm crystal

14      clear on that.

15      Dr. Stern wants to make the same argument

16      and take the same position that Nuance took in

17      our original Markman hearing that I argued with

18      Your Honor, and I'm going to read it so we're

19      on the same page.  This is Docket Number 316

20      and page 26 line 13 through page 27 line 9.

21      Your Honor starts out, "So Mr. Lender,

22      was I correct when I understood you to say that

23      if the speech recognition, the storage, or the

24      processor, or the input or the output or

25      whatever that other thing is that I can't see

1      because my screen is cut off, of the speech

2      recognition system, if one of those or two of

3      those is with the remote system, is that

4      covered by what you're trying to get me to

5      construe this claim to mean?"

6           Mr. Lender:  "No.  We have been very

7      clear, Your Honor, that we say the voice input

8      device that obtains the speech is at one

9      location and the speech is recognized at a

10     different location:

11          Your Honor:  "But" -- this is what you

12     say, Your Honor.  "But you're not helping me

13     when you say the speech is recognized because

14     that's getting to your apportionment, and I

15     have to tell you I agree with Mr. Wheeler.

16     There is nothing in here about apportioning out

17     speech recognition system so that part of it

18     cannot be remote.  That's what I'm trying to

19     understand.  Are you, with your construction,

20     trying to allow that some part of the speech

21     recognition system, the processer, the input,

22     the mass storage, the system memory, one of

23     those other parts or some other part be with

24     the remote communication system?

25          The answer:  "No."

```
 1            That's the exact position they're trying
 2      to prevent us from taking right now.
 3            THE COURT:  Okay.  So, Mr. Desai,
 4      point me to -- are you saying that they should
 5      not be able to take that position that the
 6      output device is part of the speech recognition
 7      system and therefore there's no infringement?
 8      Is that your complaint now, or is it something
 9      different?
10            MR. DESAI:  It's slightly different,
11      and first let me start with.
12            THE COURT:  Stop.  Stop.  Before
13      you -- when you say "slightly different,"
14      you're okay with them saying exactly what I
15      just said, which is Dr. Stern is going to say,
16      look, it has to be separate from the rest of
17      it.  The output device is part of it.  It's not
18      separate from that.  No infringement.  That's
19      okay?
20            MR. DESAI:  That's not okay because
21      he's not applying the construction of "speech
22      recognition system."  We're eliminating the
23      part from the speech recognition construction
24      that says it's the things that recognize
25      speech.  The predicate is it has to be part of
```

```
 1      the stuff that recognizes speech.

 2              THE COURT:  All right.  I'm denying

 3      the motion because I think that what Dr. Stern

 4      is saying is consistent with the claim

 5      interpretation.

 6              With that being said, MModal, you cannot

 7      have Dr. Stern get up there and say the claim

 8      scope requires something, but you can have him

 9      say this is what the claim says, this is what

10      the interpretation is, and they don't meet that

11      interpretation, and if it starts getting into

12      claim construction, I'll deal with it at trial,

13      but I think that Nuance is over-reading my

14      ruling there, so that motion is denied.

15              Okay.  So next -- that was DI 396, which

16      is denied.

17              Next, we have the summary judgment on

18      abuse of process and unfair competition, and

19      this one, Plaintiff, it seems to me that there

20      are certainly issues of fact disputed here.

21      Tell me why that's not true.

22              MR. LENDER:  Your Honor, this is

23      David Lender from Weil Gotshal.

24              The claim is now down in ███████

25      ███████████████████████  I believe that's the
```

1    only (audio failure) for which MModal damages

2    expert calculated any damages for this claim,

3    and both claims, unfair competition or abuse of

4    process, require some overt, willful act, some

5    sort of wrongful interference by Nuance beyond

6    just filing a lawsuit, and the evidence is

7    clear -- the evidence is clear that there is no

8    evidence that Nuance ever communicated with

9    ██████████████████ because MModal's 30(b)(6)

10   deposition on the very issue and MModal's

11   30(b)(6) witness, Mr. Frazer said that he is

12   not aware of anyone at Nuance who talked to

13   ██████ about the lawsuit.

14           THE COURT:  So stop.  Let me just

15   understand.  I don't know if this is

16   Mr. Wheeler Mr. Callahan or someone else.

17           As I read it, you want us to think it's

18   only limited to ██████, but it seems like

19   MMOdal was saying, look, we have others.  We

20   have the ████████████████████████ as well as

21   ██████, so do you agree that this is only down

22   to ██████ or not?

23           MR. CALLAHAN:  Your Honor, it's David

24   Callahan.  I'll be speaking to issue on behalf

25   of MModal.

1          We don't agree with that.  The fact of

2     the matter is that our expert quantified the

3     actual harm caused with respect to ████ but

4     neither unfair competition nor abuse of process

5     claims are limited to instances in which you

6     are able to specifically quantify the damages.

7     Both nominal and punitive damages are available

8     in claims in Delaware for unfair competition

9     and abuse of process, so while our expert

10    quantified specific damages with respect to

11    ████, the cause of action is broader than

12    that and includes additional efforts, as

13    detailed in our opposition to their motion for

14    summary judgment, Your Honor, with respect to

15    other (audio failure).

16          THE COURT:  Okay.  Let me hear a

17    response to that from the plaintiff, given that

18    it's not just ████ who's at issue.

19          MR. LENDER:  Your Honor, it is, in

20    fact.  The law is clear in Delaware that both

21    claims require evidence of harm.  For unfair

22    competition, we cited the Tri-State case from

23    Judge Andrews, 884 F 2d. 168 at 183 where Judge

24    Andrews said that unfair competition claim,

25    quote, clearly requires harm as per an abuse of

1     process claim.

2                THE COURT:  But the fact that it

3     requires harm doesn't mean that the expert has

4     to get up there and quantify damages.  If

5     MModal has some evidence of the value of the

6     lost business on the ██████████, that's

7     sufficient, isn't it?

8                MR. LENDER:  The only evidence that

9     they have offered in this entire case for the

10    damages for their injury is their expert.  He

11    only quantified it for ██████.  That's it.

12    There's nothing else.

13                THE COURT:  Mr. Callahan, I assume

14    you don't agree with that; right?

15                MR. CALLAHAN:  We don't agree with

16    it, Your Honor.  This is detailed on page four

17    through six of our opposition.  I could go

18    through as much of it as Your Honor would like.

19                THE COURT:  I read that.  I got the

20    same issue.

21           So what I'm going to do here is I think

22    that there are issues of fact.  MModal

23    identified two customers in its opposition

24    that, ultimately, walked away from finalizing a

25    deal with MModal, and MModal explains with some

1    evidence that a Nuance employee repeatedly

2    emphasized this lawsuit in communications with

3    the ███████████████ .

4         MModal asserts, again with some evidence,

5    that Nuance then targeted communications about

6    the lawsuit to a select number of healthcare

7    providers, and I think there is a genuine

8    factual dispute as to whether any or all of

9    these constitute the requisite overt act for an

10   abuse of process claim.

11        Moreover, MModal has also shown that it

12   did ultimately move business of at least

13   ████████████████ and ████████ to Nuance.  This is

14   sufficient to raise genuine dispute of material

15   facts such that summary judgment is

16   inappropriate as to the abuse of process claim,

17   and, as to unfair competition, similar

18   reasoning holds.  MModal has raised a genuine

19   issue of material fact as to whether it had a

20   reasonable business expectation in the ████████

21   ████████ and ████████ and that Nuance's actions

22   relating to press about this lawsuit wrongfully

23   interfered with those business expectations, so

24   I'm denying the motion for summary judgment on

25   abuse of process and unfair competition claims.

1          And that reminds me I previously denied

2     the motion, the Daubert motion, on Stern, but

3     there were actually two issues in that one.

4     There was the one that I thought was easy and

5     then the other one, and the one that I thought

6     was easy got me so distracted that I lost track

7     of the remote session issue.

8          So for the -- so the first part of that,

9     as I understood it, was the output device.  The

10    second part deals with a remote session, and

11    that one, I guess my question for Nuance is,

12    given the construction of "remote session," do

13    you dispute that steps must be performed at a

14    location other than the input device?

15          MR. DESAI:  Your Honor, Anish Desai.

16     I think you're asking about the Daubert

17    on Dr. Stern.

18          THE COURT:  Yeah, I'm sorry.  I went

19    back to that because I realized I only dealt

20    with part of it.

21          MR. DESAI:  I believe the second part

22    of our motion on Dr. Stern has to do with him

23    requiring that certain activities have to take

24    place:  Voice activity detection, feature

25    extraction, and context dependent presentation.

1          That was the second part of our motion.  I'm

2     not sure where Your Honor is getting the remote

3     session part from.  I think that's more about

4     the motion to strike that MModal filed.

5               THE COURT:  Hold on.  I'm just

6     pulling up his report and the parts of it.  I'm

7     starting at 118, which is where your complaints

8     were.

9               MR. DESAI:  Right.  I think,

10     actually, the best paragraph to summarize it is

11     paragraph 123, and I could read the portion if

12     you'd like.

13               THE COURT:  That's fine.  I have it

14     hear, so go ahead and explain what your

15     position there is.

16               MR. DESAI:  So the last sentence kind

17     of summarizes how he's interpreting the claim

18     for purposes of his opinion, that in order to

19     fall within the scope of claim 1 as construed,

20     speech recognition system must perform voice

21     activity detection, feature extraction, and

22     context-dependent presentation at a different

23     location than the input voice device.

24          Now, we agree that the the speech

25     recognition has to take place remotely.  We're

1    going to make that case and show that and

2    present that.  He's -- now we're saying that

3    other things also have to take place remotely.

4    These other things are not in the claim and

5    they are not in the claim construction.  He's

6    added requirements for things that have to

7    happen remotely that are not specified in

8    either the claim or in the construction that

9    has been presented.

10          THE COURT:  Okay.  I just read that

11   as saying these are examples of what the speech

12   recognition system does.  Why is this -- I

13   don't understand why it's claim construction.

14          MR. DESAI:  In order to fall within

15   the scope of claim 1 as construed, these three

16   things must be done remotely.

17          THE COURT:  Okay.  Let's assume that

18   he can't say what the scope of claim 1 is.  Why

19   can't he say it has to be remote from the

20   speech recognition system, a speech recognition

21   system must do these things, and in MModal's

22   product, these are not remote.  Why can't he

23   say that?

24          MS. ELLIOT:  Because he has not

25   linked those things to recognizing speech.  In

1    other words, voice activity detection is not

2    the step of recognizing speech.  He was deposed

3    and we asked him what is recognizing speech,

4    and he said taking the audio and turning it

5    into text.  These are not things -- these are

6    ancillary to that.

7              THE COURT:  Mr. Wheeler?

8    Mr. Callahan?  Which of you gets this one.

9              MR. WHEELER:  Your Honor, this is

10   Kevin Wheeler.  I'll take this one.

11         This is not claim construction, what he's

12   doing, and it is a factual issue for the very

13   same reason that the output device issue is a

14   factual issue.

15         And, again, going back to Your Honor's

16   order denying MModal's motion for summary

17   judgment on the output device issue, where Your

18   Honor said the dispute is factual whether

19   MModal's output device is remote from the rest

20   of the speech recognition system pursuant to

21   the agreed-upon definition of speech

22   recognition system.

23         You can replace "output device" in that

24   exact same ruling and sentence with MModal

25   capturing, process audio segments, performing

1    voice activity detection, performing feature

2    extraction, and performing context-dependent

3    presentation of --

4              THE COURT:  Okay.  So, Mr. Wheeler,

5    if he isn't say -- I get why he says to fall

6    within the scope of claim 1.  He's basically

7    saying in order to infringe claim 1, the speech

8    recognition system -- but is what he's saying

9    in these paragraphs really that?  And speech

10   recognition system includes voice activity

11   detection, feature extraction, and

12   context-dependent presentation?

13             MR. WHEELER:  What he is saying -- he

14   is not opining on claim construction.  I want

15   to be unequivocal about that.

16             THE COURT:  I get that.  I need you

17   to answer my question so I know if I'm

18   understanding it.  If I'm not, you can tell me,

19   but don't not answer my question and talk about

20   something else.

21        Okay.  Is what he's saying, in essence,

22   that these activities, voice activity

23   detection, feature extraction, and

24   context-dependent presentation of the

25   recognition results, is he saying those are

```
1        part of the speech recognition system?
2                MR. WHEELER:  Correct, he is saying
3        those are part of speech recognition, which
4        is --
5                THE COURT:  And you're saying that's
6        an issue of fact as to whether they are or they
7        aren't --
8                MR. WHEELER:  Correct.
9                THE COURT:  -- and if Mr. Desai says
10       that Dr. Stern said something different at his
11       deposition, he can cross-examine him on that;
12       right?
13               MR. WHEELER:  Absolutely, Your Honor.
14               THE COURT:  All right.  So I'm going
15       to deny the motion as to these issues as well
16       because I think that they are issues of fact
17       and not issues of claim construction, but,
18       again, I will just caution the defendants to be
19       careful in what they ask Dr. Stern in terms of
20       opining on the scope of the claim rather than
21       is it factually something that falls within the
22       claim as construed.
23          Okay.  Then we have Plaintiff's summary
24       judgment on prior art estoppel, and I guess I
25       need to understand -- let me ask MModal this.
```

1        Who's going to handle this?

2                (Cross-talk.)

3                UNIDENTIFIED SPEAKER:  I was going to

4        introduce him.  Stephen O'Donahue will handle

5        this for MModal.  Sorry.

6                THE COURT:  All right.

7        Mr. O'Donohue.

8            So it seems to me -- and I want to take

9        these two separately because the issues seem a

10       little bit different to me, but is it the case

11       that for the OSSIM system the issue is one

12       publication, the Teal 1998 reference.  That's

13       what we're talking about?

14               MR. O'DONOHUE:  That is correct, Your

15       Honor.  Steven O'Donohue.

16               THE COURT:  All right.  Do you agree

17       that the Teal 1998 reference is a printed

18       publication that could have been raised in the

19       IPR?

20               MR. O'DONOHUE:  We agree, Your Honor,

21       it was certainly a printed publication.  It was

22       not raised in the IPR, but, because it was a

23       printed publication, that was within the realm

24       of possibilities.  Yes, Your Honor.

25               THE COURT:  All right.  Okay.  Now,

1      for the MedLEE system, there are printed

2      publications as well as confidential documents

3      that are being relied on; right?

4                  MR. O'DONOHUE:  That's correct, Your

5      Honor.

6                  THE COURT:  Okay.  And the printed

7      publications, again, you're not saying that

8      they could not -- that they're not printed

9      publications that could have reasonably been

10     raised in the IPR; right?

11                 MR. O'DONOHUE:  So our position on

12     that, Your Honor, is that those printed

13     publications -- I think there were eight of

14     them -- could not have been reasonably raised

15     in the IPR and the reason is because the PTAB

16     would have required a motivation to combine all

17     eight of those references, and the Phillips

18     case that we cited in our opposition brief

19     grappled with the same issue and said that's

20     not something a petitioner could reasonably do,

21     when you get to that number of motivations to

22     combine.

23                 THE COURT:  All right.  Let me

24     hear -- I think I understand those issues.  Let

25     me hear from Nuance.

1           MR. BOSCO:  Yes, Your Honor.  This is

2      Steven Bosco with Weil on behalf of Nuance.

3           I'll just jump into the MedLEE issue.  To

4      be clear, in their opposition, MModal did not

5      contest that any of the publications that we

6      seek to have estopped -- that it didn't know

7      about them or that they weren't reasonably

8      available.  That's not an argument they're

9      making and they can't make it because most of

10      the publications are identified in invalidity

11      contentions that they submitted before they

12      filed their IPR petition.

13           THE COURT:  But there's the

14      additional four.  I mean, where I'm getting

15      confused on the MedLEE system is you have eight

16      publications and four confidential documents,

17      but in IPR, estoppel applies to grounds not

18      references, so I'm -- for the MedLEE, I need

19      you to address why they are estopped as to the

20      grounds when it seems like it's admitted that

21      there were things that could not have been

22      raised in the IPR proceeding.

23           MR. BOSCO:  Sure, Your Honor.  So I

24      think the Wasica case is instructive on this,

25      and, somewhat ironically, it's the one that

1      MModal attempts to rely on, but in that one

2      Judge Stark has a somewhat similar set of facts

3      where there was an invalidity ground that had a

4      lot of publication but then it also had some

5      product evidence, and what Judge Stark said is

6      he looked at the substance of the ground and

7      says this ground, the substance of the ground,

8      would have been put before the PTAB in the IPR.

9      The fact that there was some additional

10     evidence that you're now trying to bring

11     forward doesn't change that.  Really, the

12     ground evidence distinction, I think, favors

13     Nuance here.  They tossed in a little bit of

14     additional evidence that, apparently, they

15     couldn't have put before the PTAB.

16         I also want to address this supposed

17     evidence.  We know nothing about what these

18     documents are, so in the briefing, MModal had

19     some attorney argument about they're

20     confidential.  There's no deposition testimony.

21     There's no declaration from anyone

22     knowledgeable.  The documents are inadmissible,

23     so we also contend that they shouldn't be

24     considered on summary judgment because they are

25     inadmissible and they can't be authenticated.

 1          That's a second reason why they shouldn't

 2      affect the analysis.

 3              THE COURT:  All right.

 4      Mr. O'Donohue, do you want to respond?

 5              MR. O'DONOHUE:  Yes, Your Honor.

 6      Just a few points in response.

 7          First of all, the Wasica case that

 8      Mr. Bosco discussed was very distinguishable

 9      from the facts here, and that is because what

10      happened in Wasica is the defendant and the

11      petitioner took the exact same art, or very

12      close to the exact same art, that was in the

13      petition and just added a prior to art device

14      as a 103 combination.  But here, there's no

15      overlap whatsoever between the evidence and the

16      grounds in -- in the prior art defenses that

17      Nuance is contesting and what was in the IPR.

18      There's no overlap whatsoever, so I just want

19      to make that point first.

20          Second, I just want to note, because I

21      don't think Nuance says this explicitly in the

22      brief, that this is their burden to prove, and

23      one thing they did not do with respect to these

24      confidential documents is show any evidence

25      that they could have been discoverable through

1          a diligent search, and a lot of the cited case

2          law discussed that as a requirement, so they

3          can't fit with the burden.

4                And to Mr. Bosco's point about

5          admissibility, I don't think that's

6          appropriately before the Court in this motion.

7          Admissibility is something that the parties are

8          dealing with through motions in limine right

9          now, and, certainly, it's something that will

10         be dealt with more at trial.

11               THE COURT:  All right.  So for this

12         one, the I401, I'm going to grant it in part

13         and deny it in part.  I'm going to deny it as

14         to the MedLEE system.  System art cannot be

15         raised in the IPR, and although there are a

16         handful of references that maybe could have

17         been raised in the IPR, there are four

18         confidential documents that could not have

19         been.  Estoppel applies to grounds, not

20         individual references, and I don't think this

21         is a situation where a previously raised or

22         could-have-been-raised ground is just being

23         remade as a system.

24               On the other hand, I am going to grant it

25         as to the OSSIM system.  OSSIM feels like a

1      different situation.  It seems like only one

2      reference is being used to show how that system

3      works and that system never actually came into

4      existence, so this is just using a printed

5      publication, the Teal reference, to argue the

6      system disclosed therein invalidates the claim,

7      and I see no reason why Teal could not have

8      reasonably been raised in the IPR, particularly

9      because MModal charted Teel in its invalidity

10     contentions in this case before the IPR was

11     filed.  So I think that OSSIM, in this case, is

12     the same as what could have been argued with

13     Teal in the IPR and estoppel is appropriate, so

14     that motion is granted in part and denied in

15     part.

16          And I think the only Daubert or summary

17     judgment that we have left is the Daubert on

18     Prowse, and as I understand it, this Daubert is

19     limited to Dr. Krauss's opinion on the

20     reasonable royalty as to the '295 patent and it

21     doesn't have anything to do with the lost

22     profits or anything on the '946 patent; is that

23     correct?

24          MR. CALLAHAN:  Your Honor, David

25     Callahan for MModal.  I'll be arguing this one,

1     and Your Honor is correct.

2                THE COURT:  So go ahead and tell me

3     anything else you think I should focus on.

4                MR. CALLAHAN:  So, Your Honor -- it's

5     David Callahan -- there is no question that the

6     underlying agreement on which the Duff and

7     Phelps report is based, on which Dr. Krauss's

8     entire opinion is based, there is no question

9     that those would be inadmissible to support a

10    reasonable royalty because they don't have

11    anything to do with the technology at issue.

12    Indeed, Dr. Prowse couldn't even recall if he

13    had looked at a number of those.

14         The question here is can he clean up the

15    inadmissible by saying, well, Duff and Phelps

16    relied on those for an entirely different

17    purpose, not valuing this particular accused

18    technology, but valuing the entirety of

19    MModal's technology across the whole business.

20    In our motion, we said that leaves out 16 of

21    the 17 systems.  There's only one accused in

22    this case.  It valued 16 other systems.

23         The question is does Dr. Prowse get to

24    take the inadmissible and make them admissible?

25    And the cornerstone of his reasonable royalty

1    argument, by virtue of somebody having done an

2    entirely unrelated analysis based on the

3    agreements.  Our view, Your Honor, is that the

4    answer to that is no.  You don't get to clean

5    these up bay saying, well, Duff and Phelps

6    relied on these to try to put some valuation

7    not for licensing purposes.  It was for tax

8    apportionment purposes, some valuation on this

9    entire business, when what the focus in this

10   case is, not the value of the entire business

11   or all of MModal's technology, but just one

12   single accused product out of its entire suite

13   of products.

14          THE COURT:  So your main issue is

15   with the reliance on the Duff and Phelps, but

16   you also seem to have an issue with, okay, even

17   if Duff and Phelps could come in, going from 20

18   down to 12 or down to 5 and back up to 12,

19   that's just sort of hand-waving and we couldn't

20   figure out -- nobody could figure out how that

21   was done; is that correct?

22          MR. CALLAHAN:  That's absolutely

23   correct, Your Honor.  The other two magic

24   steps -- there's another starting point that is

25   20 that is ultimately based on agreements that

1      I think we all agree would not pass Federal

2      Circuit muster in terms of relatedness to this

3      technology.  But then there are, as Your Honor

4      points out, two further magic and

5      unreproducible by Dr. Krauss's own admission

6      steps, one of which he says 20 sounds like a

7      big number.  I'll take it down to 5 as some

8      kind of unfollowable apportionment and then

9      I'll take that 5 back up to 12.  So we have a

10     problem, Your Honor, as you correctly point out

11     with each of those three steps, each one of

12     them standing alone.

13              THE COURT:  So let me ask you this,

14     then, Mr. Callahan.  Assume -- if I were to

15     agree with you that Dr. Prowse can't opine on

16     this royalty, you're not saying that they

17     couldn't put in some other evidence of what a

18     reasonable royalty would be, given that if

19     there were infringement, that would be the

20     minimum that they're entitled to; right?

21              MR. CALLAHAN:  As long as -- yes,

22     Your Honor, but it's got to be in Krauss's

23     report.

24              THE COURT:  I'm saying they could

25     still put in evidence not through Dr. Prowse;

1          right?

2                    MR. CALLAHAN:  Sure, Your Honor.

3          They could put in evidence and they could say,

4          for example, MModal, you made a lot of money

5          selling Fluency Direct.  MModal, isn't it true

6          that this was a profitable product?  MModal

7          isn't -- aren't all these other facts accurate?

8          And then I suppose in closing, based on the

9          instruction Your Honor will give the jury on

10         Georgia Pacific and the other reasonable

11         royalty instructions, they could argue from the

12         presence of those facts in the record if they

13         supported something.

14                   THE COURT:  Let me ask Nuance, then.

15         Go ahead.  What's your response on both the

16         issues involving the Duff and Phelps royalty,

17         which is on a lot more than anything having to

18         do with the products at issue or the patented

19         technology in those or the alleged patented

20         technology in those products, and then I also

21         want to understand the down 5 and up to 12.

22                   MR. LENDER:  Your Honor, this is

23         David Lender from Weil Gotshal for Nuance.

24              Let me first start with the Duff and

25         Phelps report.  As Your Honor knows, the Duff

1          and Phelps report is not just some random

2          report.  This is a third-party report initiated

3          by 3M to value the technology that 3M was

4          buying.  And this technology, no question about

5          it, that technology includes the technology

6          that's alleged to infringe the '295 patent, and

7          I'll get to, in a moment, as to how important

8          the technology that's accused is directed to

9          the overall technology.

10              What Duff and Phelps found -- and there

11          are two things that are very important.  One is

12          that 100 percent of the revenue is what was

13          attributable to the technology and what Duff

14          and Phelps did was it (audio interruption) from

15          royalty methods, basically saying how much

16          would it cost to take a license to this

17          technology, for lack of a better word, and they

18          came up with 20 percent.  So Callahan keeps

19          referring to the licenses, but Duff and Phelps

20          were very clear that they were not just relying

21          on licenses.  Duff and Phelps makes clear that

22          they were valuing the technology and they

23          considered both qualitative and quantitative

24          factors, including --

25              THE COURT:  Does proprietary

1        technology in Duff and Phelps include IP.

2              MR. LENDER:  It does include IP, and,

3        as Mr. Callahan said, I think there were

4        roughly 17 applications that were included in

5        the technology, but, Your Honor, this is where

6        the 20 percent down to five is so critical and

7        so important.  It's the fact that MModal had

8        this -- glosses over.  As Your Honor knows, the

9        fact that there's 17 applications doesn't

10       necessarily tell you what's at the heart of

11       this technology that Duff and Phelps was

12       valuing, and if you look at Krauss's report, he

13       explains -- he goes through and shows in

14       Exhibit 7C that the speech technology -- the

15       speech technology revenue actually constitutes

16       about █ percent of the total technology, and,

17       as I said, Duff and Phelps value the technology

18       based on the revenues.

19             Just based on what Prowse said,

20       █ percent of that 20 percent would constitute

21       the value of Fluency Direct.  He actually

22       allocated down to 5 percent for the value of

23       the '295 patent.  So that apportionment from 20

24       percent for the overall technology down to 5

25       percent, Dr. Prowse explains it.  There's a lot

1    of qualitative things he talked about about how

2    important Fluency Direct was, articles and

3    presentations by 3M that talk about that the

4    accused Fluency Direct is the heart of the

5    technology, but there was also quantitative

6    evidence, what I just said.  ■ percent of the

7    technology revenues is associated with Fluency

8    Direct, and he only apportioned out 5 percent.

9         And in terms of going from 5 percent back

10   up to 12 percent, Dr. Prowse went through and

11   did a Georgia Pacific analysis and went through

12   every factor and showed that virtually all of

13   them had an upward trend.  They were all going

14   up or significantly up.  And that's the same

15   thing that happened in Comcast, Your Honor,

16   where somebody tried to challenge that there

17   was no mathematical formula, and the Court

18   rejected the Daubert and said that's -- you can

19   cross the person on it.

20        Your Honor, your Intuitive Surgical

21   decision was the same thing.  Dr. Prowse

22   happened to be at issue there as well, and

23   based on the facts and circumstances that he

24   explained, he went through every single Georgia

25   Pacific analysis and showed why there was an

1      upward -- why it led to an upward.  And as Your

2      Honor knows, mathematical precision is not

3      required.  What is required is a detailed

4      analysis through Georgia Pacific, which is what

5      Dr. Prowse did.

6              THE COURT:  Okay.  Any response,

7      Mr. Callahan?

8              MR. CALLAHAN:  Sure, Your Honor, just

9      a couple points, and these are in our brief,

10     but I think they're worth highlighting.

11          This issue of apportionment.  Mr. Lender

12     concedes that the Duff and Phelps analysis

13     looked at the entirety of the company's

14     technology and intellectual property assets,

15     not the portion that is at issue in this case.

16          We asked Dr. Prowse at page five in our

17     brief -- we asked Dr. Prowse what did you do to

18     try to understand how important this was?

19     Mr. Lender says this comes from their damages

20     expert or their liability expert, Dr. Polish.

21     What he said at his deposition is, "Based on

22     discussions with Dr. Polish, I understand the

23     '295 patent is the and not an insignificant

24     piece of the proprietary technology."  We

25     pressed him and pressed him on that, and he

1    couldn't do any better than that.  That is the

2    sole factual basis for their attribution, his

3    initial attribution and then subsequent taking

4    the 20 down to 5 before he takes it up to 12.

5            That, in our view, Your Honor, doesn't

6    pass Daubert muster.  This will allow them to

7    get up, wave his arms around in a way that is,

8    frankly, Your Honor, not effectively subject to

9    cross-examination and goes into issues that are

10   well beyond the ken of the average juror, and

11   Daubert is perfectly applicable here to be a

12   gatekeeper and limit this kind of sort of

13   arm-waving, even if it is disguised in a

14   325-page expert report.

15           THE COURT:  All right.  I think I've

16   heard enough.  Thank you.  I'm going to grant

17   MModal's motion to exclude the opinion of

18   Dr. Prowse as related to the reasonable royalty

19   of the '295 patent.  I previously set forth the

20   legal standard in ruling on such motions in

21   AgroFresh v. Essentiv LLC, number 16-662-MN.  I

22   incorporate that law here and will set it out

23   in an order following this hearing with my

24   ruling.

25           Plaintiff's expert Dr. Prowse opines that

1       an ongoing royalty of 12 percent on the Fluency

2       Direct software is the appropriate reasonable

3       royalty for infringement damages on the '295

4       patent.  To reach that conclusion, Dr. Prowse

5       starts with the Duff and Phelps report, which

6       was generated by a third party in connection

7       with 3M's acquisition of certain MModal

8       business.  That report was generated in July of

9       2019, about seven years after the hypothetical

10      negotiation date in May 2012.

11              Dr. Prowse then purports to do an

12      apportionment of that rate down to a baseline

13      rate of 5 percent and revises it upward to 12

14      percent.  Ultimately, I agree with MModal that

15      Dr. Krauss's opinion does not have the

16      reliability required under 702.  First, the

17      starting point for his baseline 20 percent

18      royalty is a report generated in July 2019,

19      seven years after the hypothetical negotiation

20      date.  This, in and of itself, makes the

21      analysis seem not particularly reliable from

22      the outset.

23              Second, the 20 percent royalty assigned

24      by Duff and Phelps is for all of MModal's

25      proprietary technology without regard to

1        differing types of technology or other services

2        accompanying the finished product, e.g.

3        customer support.

4             Moreover, that proprietary technology

5        also includes intellectual property held by

6        MModal.  There is no indication anywhere that

7        the 20 percent had any relation at all to the

8        accused Fluency Direct product or the

9        technology of the '295 patent, so I think that

10       Dr. Krauss's starting point for his analysis is

11       unreliable and not tethered to the facts of

12       this case, i.e., infringement of the '295

13       patent by MModal's Fluency Direct product.  For

14       these reasons, his reasonable royalty opinion

15       should be excluded under 702.

16            I also think that his apportionment down

17       to 5 percent followed by an increase back up to

18       12 percent based on loose factors is

19       unreliable.  As for going from 20 percent to

20       5 percent based on apportionment, there seems

21       to be little in the way of analysis as to why 5

22       percent was chosen.  Dr. Prowse asserts that he

23       relied on two agreements in the Duff and Phelps

24       report to gauge whether 5 percent makes sense,

25       the Voicenet agreement and the Phillips Speech

1    agreement with royalty rates ranging from 5 to

2    20 percent.

3         As MModal points out, those underlying

4    agreements were broader than the license that

5    would result from the hypothetical negotiate

6    here.  The Voicenet agreement apparently

7    included a license to various IP rights along

8    with a multitude of software products and

9    derivatives of products, and the Phillips

10   agreement involved a perpetual license to

11   software, not a limited-term license to a

12   patent with a definite expiration date.  I do

13   not think these agreements are comparable to

14   the '295 patent or probative of the

15   hypothetical negotiation here.

16        Dr. Prowse offers not real rationale or

17   justification for how he came up with 5 percent

18   or why 5 percent reflects the value of Fluence

19   Direct or the value of the '295 patent to

20   Fluency Direct, so I think that Dr. Krauss's

21   apportionment down to 5 percent is unreliable

22   and untethered to the facts of this case.

23        Finally, Dr. Krauss's upward adjustment

24   from 5 percent to 12 percent, again, it seems

25   likes there is no connection between the facts

1    of this case and the ultimate number of

2    12 percent.  At best, I think Dr. Prowse

3    recited some facts about the technology of the

4    case in the accused Fluency Direct product and,

5    alongside that, revised the 5 percent up to

6    12 percent.  The problem is that I do not see

7    anywhere where Dr. Prowse connects the two.

8    That is, his analysis is lacking anything about

9    how the facts of this case suggest that

10   12 percent is an appropriate number here.

11        More troubling is that he apparently

12   conceded that others would have difficulty

13   reaching the same conclusion without having his

14   report in front of them, so I think this

15   portion is also unreliable.

16        So based on the reasons I've just stated,

17   Dr. Krauss's reasonable royalty opinion as to

18   the '295 patent will be excluded.  And to be

19   clear, everyone agrees that this ruling applies

20   only to Dr. Krauss's opinion as it relates to

21   the reasonable royalty for the '295 patent.

22   His opinion as to lost profits for that patent

23   as well as all of his opinions of the '946

24   patent are not excluded from this ruling and

25   this does not exclude Nuance from adducing

1  other facts that may lead to what an

2  appropriate royalty in this case would be or

3  arguing what that should be based on facts it

4  adduced.

5      So that is my ruling on that, so I'm

6  granting that motion, which is DI 382, and,

7  with that, I think I have addressed all of the

8  Daubert and summary judgment motions that we

9  had and we now just have the motion to strike,

10  which the motion to strike does relate to the

11  first remote session issue.

12      This is MModal's motion.  Who's going to

13  argue this one?

14      MR. CALLAHAN:  Your Honor, it's David

15  Callahan again.  I'll be arguing this one for

16  us as well.

17      This is an issue, Your Honor, where we

18  believe it is crystal clear that Dr. Polish is

19  trying to construe this Court's construction,

20  at best.  What's worse is he's attempting to

21  construe it in exactly the opposite way in

22  which we believe it was issued.  This has been

23  used not only by Dr. Polish but also by

24  Dr. Prowse, who argued that there can be 1, 10,

25  100 or 10,000 first remote sessions for a

1           speaker, and their basis for that is this
2           Court's comment that Your Honor did not mean to
3           say that where a speaker-specific model has
4           later been erased or lost that one could not
5           have another, a subsequent, first remote
6           session.  That situation, where
7           speaker-specific model is later erased or lost,
8           will not be in front of the jury in this case.
9           It is utterly irrelevant to anything that
10          Dr. Stern for us will say or anything that
11          Dr. Polish for Nuance will say.
12               Instead, what they are attempting to do
13          is utilize that comment -- doesn't affect any
14          factual situation at issue in this case -- to
15          say there can be multiple first remote sessions
16          and that, Your Honor, is the upshot of what we
17          have to say there.
18               We went through, in terse fashion, the
19          Pennypack factors.  This is hugely prejudicial
20          at this stage of the game and not really
21          rectifiable, in our view, Your Honor, by
22          anything other than saying you cannot adduce
23          this theory of claim interpretation or any fact
24          pursuant to which something that is other than
25          a session that is the first time the accused

1    system obtains a particular speaker's speech is

2    infringing.  And I'll stop there, Your Honor,

3    and see if you have questions on it.

4              THE COURT:  No, I want to hear from

5    Nuance.  I mean, it did catch my attention that

6    Dr. Polish is saying there can be 10,000 or

7    whatever first remote sessions because that is

8    not what I intended in my claim construction.

9    What I was saying is that it's the first time

10   speech was obtained, but, for example, if the

11   system forgets that it ever obtained it because

12   of some thing that apparently never happens

13   there could be an exception to that, and, as I

14   understand what Dr. Polish is saying is, he's

15   saying, yeah, sure, you can obtain speech a

16   whole bunch of times but unless the speech

17   recognition system does something with it to

18   generate whatever the model is, well, all those

19   times you obtained it is not the first remote

20   session.  That's not what I thought I was

21   saying.

22        I guess my question is, is that what

23   Dr. Polish is saying?

24             MR. DESAI:  Your Honor, this is Anish

25   Desai for Nuance.  That is not what Dr. Polish

1     is saying.  I think -- and I'd like to go

2     through the paragraphs that they're actually

3     trying to strike because in their letter they

4     did not and they tried to broad-brush this with

5     this argument but did not go through the

6     paragraphs which are addressing non-infringing

7     alternatives that MModal is proposing.

8          So this has to do with lost proposed.

9     And they proposed a bunch of non-infringing

10    alternatives, and we explained why they're not

11    actually not non-infringing.  They still

12    infringe.

13         So if I start with paragraphs 41 and 42

14    of Dr. Polish's report, there, he says what the

15    construction is and points out that under the

16    Court's construction there can be more than one

17    first remote session.  It's absolutely explicit

18    in the Court's construction, if this scenario

19    occurs where you talk to the system, the

20    speaker profile is made but then deleted.

21              THE COURT:  Can you hold on?  Because

22    this is what caught my attention here, which is

23    there can be -- it says the speaker can have

24    dictated in the past and still have a session

25    that is the first remote session.  Then it says

1     if the system does not have a speaker-specific

2     model for that user when the session is

3     initiated, and that, I think, is stronger than

4     what I was suggesting.  It seems like he's

5     saying you can obtain speech, but if we haven't

6     yet made a speaker-specific model, we can

7     obtain it again and it will still be the first

8     session, so that's what caught my attention.

9              MR. DESAI:  Okay.  I think you have

10    to read the next sentence, which goes in

11    construction, which says this is reflected in

12    the Court's statement that the construction

13    does not exclude the scenario.  He was

14    referring to to statement.  I don't think there

15    was any intention there to say that you can go

16    1,000 sessions, keep obtaining speech, and then

17    the 1,000th one is the first remote session

18    simply because you never did anything.  He was

19    referring to the scenario where you had speech

20    before, you have another session later on, but

21    that can still be a first remote session if, at

22    that time, the system has last your profile or

23    it's been erased.  He was saying that literally

24    it is possible to have more than one first

25    remote session.

```
 1            Now if we go to the other paragraph, I
 2      think this is where we get into non-infringing
 3      alternatives, and most of them have, in our
 4      view, nothing to do with this issue.  But we go
 5      to paragraph 68.  This is -- they have.  I'm
 6      going to -- it's 103 to 107, Your Honor, and
 7      this is a non-infringing alternative where
 8      MModal is talking about changing their system
 9      so that the user --
10            THE COURT:  Wait.  Wait.  Can you go
11      to 64 to 67 first?
12            MR. DESAI:  Sure.  I think 64 to 67
13      they're not actually trying to exclude, but we
14      put that in our letter because it gives the
15      background.
16            THE COURT:  It's paragraph 68 that
17      they want to exclude.
18            MR. DESAI:  That's correct, but 64 to
19      67 are the setup and it's explaining how
20      there's this initial experience wizard where
21      you sit down, log in, and you can do -- it's
22      like a training for, like, the user.  You have
23      to calibrate the mike.  A few minutes of stuff
24      you have to do to get rolling.
25            And there's this scenario that Dr. Polish
```

1    was addressing where somebody sits down to use

2    it and for some reason, inexplicably, their

3    internet connection goes away or they get up

4    and walk away and come back, and Dr. Polish's

5    explanation was this is not a plausible

6    scenario anyway, but even if it is, it's still,

7    in his view, considered one session where the

8    person is sitting and doing it even though

9    there's this interruption in the middle.

10            THE COURT:  I got that, and I don't

11   think anyone is saying that's a problem.  I

12   think the problem was -- and I'm reading in

13   your letter, which is a summary of 68.  It

14   says, "Nevertheless, Dr. Polish explained that

15   if this were to be considered two sessions" --

16   so the first one and then a second one after

17   the blip -- "the session involving dictation

18   would still be first remote session because at

19   the time of that session there would be no

20   speaker-specific model for that user," and

21   that's why it keeps catching my attention that

22   he focused on not is it the first time the

23   speech was obtained but is there already a

24   speaker-specific model.

25            MS. ELLIOT:  Well, I think this is

1     the only paragraph where that's -- that's where

2     he says -- that's where that comes up.  I think

3     the other paragraphs have other issues that are

4     different.

5            THE COURT:  Okay.  So what do we do

6     about this paragraph, then, where this issue

7     is?

8            MS. ELLIOT:  Your Honor, I think,

9     frankly, that if Your Honor thinks this is a

10    problem with respect to the construction, we're

11    happy to withdraw paragraph 68.  It's not an

12    essential issue for us.

13           THE COURT:  So we will -- that's

14    withdrawn.

15      Okay.  Now we have 103 to 107, and,

16    again, here, we have the -- this is your

17    summary.  "Dr. Polish explained that even if

18    the blip means there are two sessions,

19    consistent with the Court's construction, the

20    later session would is still be a first remote

21    session because there would be no

22    speaker-specific model for the user."

23           MS. ELLIOT:  Right, so I would say

24    there's three arguments here with these

25    paragraphs, and one is that the blip, it's

1     still one session.  That's unaffected by this

2     issue.  And then the last argument is that it

3     would infringe under the doctrine of

4     equivalents.  I think that's also unaffected

5     because we're allowed to make a doctrine of

6     equivalents argument if it's not within the

7     literal scope of the Court's construction.

8               THE COURT:  Okay.  I got that.  So

9     the middle part that caught my attention.

10              MS. ELLIOT:  So I think if that

11    middle part, it's like paragraph 68.  We can

12    withdraw that portion.  I want to be clear that

13    we're allowed to make, the other two arguments,

14    that are in those paragraphs, which are that

15    it's still one session and that the DOE

16    applies.

17              THE COURT:  That seems okay to me,

18    but let me just, before I rule on that,

19    Mr. Callahan, I didn't see that as the issue

20    you were having; is that correct?

21              MR. CALLAHAN:  Your Honor, it's David

22    Callahan.  Thank you.  The issue that we've

23    got --

24              THE COURT:  I'm sorry.  You're

25    winning on the no-speaker-specific-model.  The

1    issue that I just asked about was -- and you

2    are not asserting that Dr. Polish can't say

3    that if there's a blip, the blip, it would

4    still be one session, and that if it's

5    considered two sessions, that it infringes

6    under the doctrine of equivalents.  That's not

7    the subject of your motion to strike; right?

8         MR. CALLAHAN:  That's correct.  We

9    are not moving to strike their DOE argument.

10        THE COURT:  What about the blip being

11   one session.  He says anyone will consider that

12   one session.  You guys can fight about that,

13   but that doesn't seem to be inconsistent with

14   my claim construction.

15        MR. CALLAHAN:  I think that is also

16   correct, Your Honor.

17        THE COURT:  Okay.  So they have now

18   withdrawn the part to the extent he's saying if

19   the blip were two sessions, it's still -- the

20   second one is considered a first because

21   there's no speaker-specific model.  They are

22   withdrawing that.

23        Okay.  So now let's look at paragraph 115

24   to 119, and, again, it seems like we have a

25   very similar issue, which, as I'm reading what

1    the plaintiff said, Dr. Polish explained how

2    under the Court's construction the second time

3    a user speaks to the system would still be a

4    first remote session because the system would

5    not have a speaker-specific model for the user.

6            MR. DESAI:  Your Honor, I think this

7    is the same situation where we would -- this is

8    like paragraph 68 except for the DOE part.  We

9    would be able to maintain the DOE argument.

10           THE COURT:  And, Mr. Callahan, the

11   DOE issue is not the subject of your motion to

12   strike; right?

13           MR. CALLAHAN:  That is correct, Your

14   Honor.  David Callahan.  That is correct.

15           THE COURT:  So no to the part about

16   it's still a remote session because the system

17   would not have a speaker-specific model.

18       So then we have paragraphs 109 to 112.

19           MR. DESAI:  Right, Your Honor.  This

20   one, I think, is not related to this

21   construction issue.  I mean, this is about

22   whether or not claim 1 can be infringed only

23   once.  There's multiple reasons why this is

24   wrong.  Dr. Stern opined on that.

25           First of all, as we talked about, the

```
 1          Court's construction plainly allows for a
 2          scenario where there can be more than one first
 3          session.  Even setting that aside, Dr. Polish's
 4          opinions in these paragraphs are retained in
 5          Step F of the claim, which involves subsequent
 6          sessions, so nothing in these paragraphs, in
 7          our view, conflicts with the Court's
 8          construction.
 9                    THE COURT:  All right, Mr. Callahan.
10                    MR. CALLAHAN:  Your Honor, it does.
11          Your Honor's construction is that a first
12          remote session, which is an element of claim 1
13          and all the dependent claims, a remote session
14          that is the first time the system obtains the
15          particular speaker's speech.  Doesn't make a
16          difference what the rest of the elements
17          require or say.  The second, third, one
18          hundredth, and one thousandth time that the
19          system obtains a particular speaker's speech,
20          that claim can't be infringed because it's not
21          the first time that the system obtains the
22          particular speaker's speech.
23                    THE COURT:  Okay.  Just give me a
24          second.  I'm just reading these paragraphs.
25               So, Mr. Desai, when it says, "I disagree
```

1          that claim 1 can only be infringed once since

2          MModal is using claim 1 every time it uses the

3          representation of the speaker's specific

4          modified speech recognition system to recognize

5          speech" -- can you just explain to me in

6          simpler words?  What is he saying?

7                    MR. DESAI:  Right.  I think this is a

8          dispute about whether the claim can be

9          infringed one time or can be infringed multiple

10         times.

11              Now, to give you an example, there's

12         steps A through F in the claim, and I think

13         MModal's position is if you can only perform

14         the step B and C one time during the first

15         remote session, the whole claim can only be

16         infringed once.

17              We have a different view, and our view is

18         for claim 1, you could have a user perform

19         steps A, B, and C -- I have to pull the claim

20         up in front of me, Your Honor.  Just a second.

21         I apologize.

22              I have it in front of me.  I think

23         MModal's position is that you can only do steps

24         A, B, C, and D and E one time; right?  That

25         would be as part of the first remote session

1        here, and you're obtaining speech, you're

2        recognizing it, you're adapting the system, and

3        then you're storing.  But then there's step F,

4        which is using it to recognize speech during a

5        subsequent remote session, and our view is that

6        every time the user uses the system during a

7        subsequent session, that's a new infringement

8        because you have the first five steps being

9        performed and a different step F, if you follow

10       what I'm saying.

11            This really has nothing to do with Your

12       Honor's construction.  It has to do with

13       whether every time a person performs a new step

14       F, that's an infringement of the claim, and our

15       position is it is.

16                 THE COURT:  Is this a damages issue?

17                 MR. DESAI:  Yes.  I think, according

18       to them, it's relevant to damages.  We don't

19       necessarily think it's that relevant to lost

20       profits, but it's still a disputed issue.

21                 THE COURT:  All right.  Mr. Callahan.

22                 MR. CALLAHAN:  Your Honor, we think

23       this goes right to the heart of the Court's

24       claim construction.  What Nuance wants to

25       argue, there's a four-year period here during

1      which we're alleged to infringe -- our

2      customers are alleged to infringe these method

3      claims.  Mr. Desai is saying that on day one of

4      that period, you can go have your first remote

5      session.  That is, I sit down, and I'm now

6      having a remote session that is the first time

7      the speaker obtains the particular speaker's

8      speech and that for the entirety of the

9      remaining damages period, whether I come back

10     six years later or a year later or three years

11     later or every single day for the remainder of

12     the four years, I get to have -- I infringe,

13     notwithstanding the fact that in the second,

14     third, hundredth, thousandth session I am not

15     practicing the first remote session element.

16              THE COURT:  Tell me what this is

17     relevant to.

18              MR. CALLAHAN:  It goes to damages

19     among other things, Your Honor.

20              THE COURT:  How.

21              MR. CALLAHAN:  Because the quantum of

22     use; right?  You're only ever using this that

23     first time and not ever thereafter.

24              THE COURT:  What I'm trying to figure

25     out for damages is if using it this one time

1      enables the person to use it every day or every

2      three years or whatever, why can't -- why can't

3      they argue that that would entitle them to the

4      same damages if they -- like, the one time they

5      infringe was so important that it enabled

6      everything else that came with it.  So I'm just

7      not understanding how this really makes a

8      difference in damages.

9                MR. CALLAHAN:  So our expert believes

10     it does.  That's in our supplemental expert

11     report.  Their expert hasn't made that

12     argument.  I suppose Nuance could make that

13     argument, but they can't say each subsequent

14     use is an infringing act.  It's not.

15                MR. DESAI:  Your Honor, may I add a

16     point?  So I think, also, this is kind of a

17     silly point from our perspective because

18     claim 2 is also asserted and there's, I don't

19     think, any debate that claim 2 is infringed

20     multiple times because it is claiming multiple

21     use.  It's claiming the step of cumulatively

22     modifying the system.  The idea here is the

23     damages issue is going to be about you only

24     used it once and never again.  It's absurd

25     because claim 2 explicitly claims cumulative

1    use, and I think, ultimately, these paragraphs

2    109 to 112 have nothing to do with the Court's

3    construction and their motion to strike.

4            THE COURT:  I'm going to deny the

5    motion as to paragraphs 109 to 112.

6        Now we have paragraph 121.

7            MR. DESAI:  I think this is another

8    one that has nothing to do with Your Honor's

9    construction.  This is a non-infringing

10   alternative that's being proposed and Dr. Stern

11   is proposing that they'll modify their system

12   so that every single time -- the first time a

13   person uses it, it's a local session and every

14   time after, it's going to be remote session.

15   And Dr. Polish said, well, that's great, but

16   that first session is not a first remote

17   session.  It's a local session, and then the

18   next time you do it and it's a remote session,

19   that's the first remote session.  This is about

20   the word "remote," not about the word "first."

21           THE COURT:  Mr. Callahan, what's

22   wrong with that.

23           MR. CALLAHAN:  Your Honor, they're

24   reading out that term.  Your Honor has

25   construed "first remote session" to mean the

1    first time the system obtains a particular

2    speaker's speech.  That could be when it is --

3    that recognition could be done locally.  It

4    could be done remotely, and all we're saying is

5    this is a relatively easy fix.  We just take --

6            THE COURT:  Wait.  Isn't it "first

7    remote session"?  I mean, I certainly never

8    meant to read "remote" out of the claim term.

9    What is the specific construction?

10           MR. CALLAHAN:  The specific

11   construction, Your Honor, is a remote session

12   that is the first time the system obtains a

13   particular speaker's speech.

14           THE COURT:  Right.  A remote which is

15   the first time, and they're saying that under

16   that one of many non-infringing alternatives is

17   not a non-infringing alternative because it's

18   not a remote session.

19           MR. CALLAHAN:  It is.

20           THE COURT:  It seems okay to me.  It

21   doesn't seem inconsistent with my claim

22   construction.

23           MR. CALLAHAN:  It's just not the

24   first time that the system obtains the

25   particular speaker's speech.

1            THE COURT:  My construction was a

2       remote session that is the first time the

3       speaker obtains the speech.  You're looking at

4       the last part and ignoring the first part;

5       right?

6            MR. CALLAHAN:  I don't think so, Your

7       Honor.  I'm saying that it is -- the remote

8       session; right?  That is the first time.  It's

9       got to be the first time the system recognizes

10      the speech.  If for four years --

11           THE COURT:  How did I construe

12      "remote session"?

13           MR. CALLAHAN:  A remote session that

14      is the first time -- that is the first time, so

15      it has to be a remote session and --

16           THE COURT:  I didn't ask about first

17      remote session.  Did I construe "remote

18      session"?

19           MR. DESAI:  Yes, Your Honor.

20           THE COURT:  How did I construe it?

21           MR. DESAI:  I'm happy to read it.  I

22      have it in front of me.

23           THE COURT:  Okay.

24           MR. DESAI:  It's a session between

25      devices in which the input voice device is at a

1 different location from the rest of the speech

2 recognition system.

3   THE COURT:  Okay.  And then in my

4 construction of "first remote session,"

5 included that it is a remote session with the

6 addition that it must be a remote session in

7 which the first time speech is obtained; right?

8   MR. DESAI:  That is correct.

9   THE COURT:  All right.  I'm going to

10 deny the motion to strike on paragraph 121, so

11 I think that addressed all of the motions that

12 I have as well as the motions to strike.

13  Is there anything else we need to

14 address?

15   MR. LENDER:  Your Honor, this is

16 Mr. David Lender from Weil Gotshal.

17  Back in April 2020 when you lifted the

18 stay on the case, you had mentioned that one of

19 the things you were going to consider was

20 whether or not to bifurcate the state law

21 counterclaims because there's an objectively

22 baseless Noerr-Pennington issue, and we said at

23 that hearing that you were going to take that

24 up at trial as to whether or not to bifurcate

25 that at trial before we get resolution of the

```
 1        issues.  Do you want us to be interested in
 2        raising that issue?  I really do believe this
 3        counterclaim has -- it's going to make the case
 4        very unwieldy.  It's going to put a lot of
 5        evidence in that is irrelevant to the patent
 6        issues and we think the objectively
 7        baselessness issue will become even clearer
 8        during the trial, but I didn't know how you
 9        wanted us to tee that issue up.
10             THE COURT:  Well, if you guys can
11        agree on that we could think about it, but my
12        issue is, you know, I hesitate to bifurcate
13        anything because our trial schedule is so
14        backed up, double and triple booked, that
15        taking a case and making it two trials rather
16        than one doesn't seem like an efficient use of
17        my time, but let me hear from defendant on
18        that.
19             MR. CALLAHAN:  Your Honor, it's David
20        Callahan for MModal.  We'll take that up --
21        with the Court's permission, we'll take that up
22        offline with our colleagues at Nuance and see
23        what we can figure out.  If we can agree on
24        something, great.  If not, we won't.
25             THE COURT:  Okay.  And then I guess
```

1          if not, you need to let me know if not with a

2          proposal for how I should deal with it, given

3          that trial is coming up and I don't have a lot

4          of time between now and then to address issues.

5          Let me know --

6                How much time do you think you need to

7          try and work that out, Mr. Callahan?

8                     MR. CALLAHAN:  Could we have until

9          Tuesday next, Your Honor?

10                    THE COURT:  Yes, that's fine.  So

11         then send me a letter telling me whether you

12         guys have agreed to something and, if not, what

13         your proposal is for how that issue should be

14         taken up by the Court.

15                    UNIDENTIFIED SPEAKER:  Thank you,

16         Your Honor.

17                    THE COURT:  Anything else?

18                    MR. CALLAHAN:  David Callahan, Your

19         Honor.  Not from MModal.

20                    THE COURT:  All right.  Thank you.

21         Have a good rest of the week.

22

23

24

25

1                    C E R T I F I C A T E

2     STATE OF DELAWARE          )
                                 ) ss:
3     COUNTY OF NEW CASTLE       )

4          I, Deanna L. Warner, a Certified

5     Shorthand Reporter, do hereby certify that as

6     such Certified Shorthand Reporter, I was

7     present at and reported in Stenotype shorthand

8     the above and foregoing proceedings in Case

9     Number 17-CV-01484-MN, *NUANCE COMMUNICATIONS,*

10    *INC. Vs. MMODAL LLC*, heard on

11    September 8, 2021.

12         I further certify that a transcript of

13    my shorthand notes was typed and that the

14    foregoing transcript, consisting of 67

15    typewritten pages, is a true copy of said

16    **MOTION TO STRIKE**.

17         **SIGNED**, **OFFICIALLY SEALED**, and **FILED**

18    with the Clerk of the District Court, NEW

19    CASTLE County, Delaware, this 8th day of

20    September, 2021.

21

22                    _____

23                    Deanna L. Warner, CSR, #1687
                      Speedbudget Enterprises, LLC

24

25

| # | 2 | 67 [4] - 50:11, 50:12, 50:19, 67:14 | 29:13 | 39:4, 39:12, 41:21, 42:10, 42:21, 44:8 |
|---|---|---|---|---|

## #

**#1687** [1] - 67:22

## '

**'295** [12] - 31:20, 36:6, 37:23, 39:23, 40:19, 41:3, 42:9, 42:12, 43:14, 43:19, 44:18, 44:21
**'946** [2] - 31:22, 44:23

## 1

**1** [15] - 5:22, 6:6, 6:7, 10:12, 20:19, 21:15, 21:18, 23:6, 23:7, 45:24, 55:22, 56:12, 57:1, 57:2, 57:18
**1,000** [1] - 49:16
**1,000th** [1] - 49:17
**10** [2] - 9:12, 45:24
**10,000** [2] - 45:25, 47:6
**100** [2] - 36:12, 45:25
**102** [1] - 6:10
**103** [3] - 29:14, 50:6, 52:15
**105** [1] - 6:10
**107** [2] - 50:6, 52:15
**109** [3] - 55:18, 61:2, 61:5
**112** [3] - 55:18, 61:2, 61:5
**115** [1] - 54:23
**118** [1] - 20:7
**119** [1] - 54:24
**12** [13] - 33:18, 34:9, 35:21, 38:10, 40:4, 41:1, 41:13, 42:18, 43:24, 44:2, 44:6, 44:10
**121** [2] - 61:6, 64:10
**123** [1] - 20:11
**13** [1] - 11:20
**16** [2] - 32:20, 32:22
**16-662-MN** [1] - 40:21
**168** [1] - 16:23
**17** [3] - 32:21, 37:4, 37:9
**17-CV-01484-MN** [2] - 1:5, 67:9
**183** [1] - 16:23
**1998** [2] - 25:12, 25:17

## 2

**2** [3] - 60:18, 60:19, 60:25
**20** [13] - 33:17, 33:25, 34:6, 36:18, 37:6, 37:20, 37:23, 40:4, 41:17, 41:23, 42:7, 42:19, 43:2
**2012** [1] - 41:10
**2019** [2] - 41:9, 41:18
**2020** [1] - 64:17
**2021** [3] - 1:13, 67:11, 67:20
**22** [1] - 9:12
**26** [1] - 11:20
**27** [1] - 11:20
**2d** [1] - 16:23

## 3

**30(b)(6** [2] - 15:9, 15:11
**316** [1] - 11:19
**325-page** [1] - 40:14
**35** [1] - 9:12
**382** [1] - 45:6
**390** [1] - 9:16
**396** [1] - 14:15
**397** [1] - 4:9
**3M** [4] - 3:18, 36:3, 38:3
**3M's** [1] - 41:7

## 4

**41** [1] - 48:13
**42** [1] - 48:13

## 5

**5** [20] - 33:18, 34:7, 34:9, 35:21, 37:22, 37:24, 38:8, 38:9, 40:4, 41:13, 42:17, 42:20, 42:21, 42:24, 43:1, 43:17, 43:18, 43:21, 43:24, 44:5
**503** [1] - 9:12

## 6

**64** [3] - 50:11, 50:12, 50:18

## 7

**702** [2] - 41:16, 42:15
**7C** [1] - 37:14

## 8

**8** [1] - 67:11
**884** [1] - 16:23
**8th** [2] - 1:13, 67:19

## 9

**9** [1] - 11:20
**95** [1] - 5:21
**97** [1] - 6:5

## A

**able** [3] - 13:5, 16:6, 55:9
**absolutely** [4] - 6:10, 24:13, 33:22, 48:17
**absurd** [1] - 60:24
**abuse** [8] - 14:18, 15:3, 16:4, 16:9, 16:25, 18:10, 18:16, 18:25
**accompanying** [1] - 42:2
**according** [1] - 58:17
**accurate** [1] - 35:7
**accused** [14] - 5:7, 5:9, 6:6, 7:18, 8:2, 9:15, 32:17, 32:21, 33:12, 36:8, 38:4, 42:8, 44:4, 46:25
**acquisition** [1] - 41:7
**act** [3] - 15:4, 18:9, 60:14
**action** [1] - 16:11
**actions** [1] - 18:21
**activities** [2] - 19:23, 23:22
**activity** [6] - 19:24, 20:21, 22:1, 23:1, 23:10, 23:22
**actual** [1] - 16:3
**adapting** [1] - 58:2
**add** [1] - 60:15
**added** [1] - 21:6,

**addition** [1] - 64:6
**additional** [4] - 16:12, 27:14, 28:9, 28:14
**address** [5] - 9:20, 27:19, 28:16, 64:14, 66:4
**addressed** [2] - 45:7, 64:11
**addressing** [2] - 48:6, 51:1
**adduce** [1] - 46:22
**adduced** [1] - 45:4
**adducing** [1] - 44:25
**adjustment** [1] - 43:23
**admissibility** [2] - 30:5, 30:7
**admissible** [1] - 32:24
**admission** [1] - 34:5
**admitted** [1] - 27:20
**affect** [2] - 29:2, 46:13
**afternoon** [6] - 3:1, 3:3, 3:11, 3:12, 3:21, 8:25
**agree** [13] - 12:15, 15:21, 16:1, 17:14, 17:15, 20:24, 25:16, 25:20, 34:1, 34:15, 41:14, 65:11, 65:23
**agreed** [4] - 5:24, 9:25, 22:21, 66:12
**agreed-upon** [2] - 9:25, 22:21
**agreement** [6] - 4:17, 32:6, 42:25, 43:1, 43:6, 43:10
**agreements** [5] - 33:3, 33:25, 42:23, 43:4, 43:13
**agrees** [1] - 44:19
**AgroFresh** [1] - 40:21
**ahead** [3] - 20:14, 32:2, 35:15
**alleged** [4] - 35:19, 36:6, 59:1, 59:2
**allocated** [1] - 37:22
**allow** [3] - 5:4, 12:20, 40:6
**allowed** [2] - 53:5, 53:13
**allows** [1] - 56:1
**alone** [1] - 34:12
**alongside** [1] - 44:5
**ALSO** [1] - 2:9
**alternative** [3] - 50:7, 61:10, 62:17
**alternatives** [4] - 48:7, 48:10, 50:3, 62:16
**analysis** [10] - 29:2, 33:2, 38:11, 38:25,

**ancillary** [1] - 22:6
**AND** [1] - 1:2
**Anderson** [2] - 3:5, 3:7
**ANDERSON** [1] - 1:16
**Andrews** [2] - 16:23, 16:24
**Anish** [4] - 3:8, 5:1, 19:15, 47:24
**ANISH** [2] - 1:17, 1:20
**answer** [4] - 12:25, 23:17, 23:19, 33:4
**anyway** [1] - 51:6
**apologize** [1] - 57:21
**APPEARANCES** [1] - 1:15
**appearances** [1] - 2:1
**applicable** [1] - 40:11
**applications** [2] - 37:4, 37:9
**applies** [4] - 4:24, 27:17, 30:19, 44:19, 53:16
**applying** [1] - 13:21
**apportioned** [1] - 38:8
**apportioning** [1] - 12:16
**apportionment** [9] - 12:14, 33:8, 34:8, 37:23, 39:11, 41:12, 42:16, 42:20, 43:21
**appropriate** [4] - 31:13, 41:2, 44:10, 45:2
**appropriately** [1] - 30:6
**April** [1] - 64:17
**argue** [5] - 31:5, 35:11, 45:13, 58:25, 60:3
**argued** [4] - 10:24, 11:17, 31:12, 45:24
**arguing** [4] - 9:2, 31:25, 45:3, 45:15
**argument** [12] - 9:18, 11:15, 27:8, 28:19, 33:1, 48:5, 53:2, 53:6, 54:9, 55:9, 60:12, 60:13
**arguments** [2] - 52:24, 53:13
**arm** [1] - 40:13
**arm-waving** [1] - 40:13
**arms** [1] - 40:7
**art** [6] - 24:24, 29:11, 29:12, 29:13, 29:16, 30:14

**articles** [1] - 38:2
**articulated** [1] - 11:11
**aside** [1] - 56:3
**asserted** [2] - 5:25, 60:18
**asserting** [1] - 54:2
**asserts** [2] - 18:4, 42:22
**assets** [1] - 39:14
**assigned** [1] - 41:23
**associated** [1] - 38:7
**assume** [4] - 4:24, 17:13, 21:17, 34:14
**attached** [1] - 5:22
**attempting** [2] - 45:20, 46:12
**attempts** [1] - 28:1
**attention** [5] - 47:5, 48:22, 49:8, 51:21, 53:9
**attorney** [1] - 28:19
**attributable** [1] - 36:13
**attribution** [2] - 40:2, 40:3
**audio** [5] - 15:1, 16:15, 22:4, 22:25, 36:14
**authenticated** [1] - 28:25
**available** [2] - 16:7, 27:8
**average** [1] - 40:10
**aware** [1] - 15:12

**B**

**backed** [1] - 65:14
**background** [1] - 50:15
**based** [15] - 5:16, 9:14, 32:7, 32:8, 33:2, 33:25, 35:8, 37:18, 37:19, 38:23, 39:21, 42:18, 42:20, 44:16, 45:3
**baseless** [1] - 64:22
**baselessness** [1] - 65:7
**baseline** [2] - 41:12, 41:17
**basis** [2] - 40:2, 46:1
**bay** [1] - 33:5
**become** [1] - 65:11
**begged** [1] - 7:3
**behalf** [4] - 3:5, 3:14, 15:24, 27:2
**believes** [1] - 60:9
**Bender** [2] - 2:10, 3:19

**best** [3] - 20:10, 44:2, 45:20
**better** [2] - 36:17, 40:1
**between** [5] - 8:5, 29:15, 43:25, 63:24, 66:4
**beyond** [2] - 15:5, 40:10
**bifurcate** [3] - 64:20, 64:24, 65:12
**big** [1] - 34:7
**Bindu** [1] - 3:4
**BINDU** [1] - 1:16
**bit** [2] - 25:10, 28:13
**blip** [7] - 51:17, 52:18, 52:25, 54:3, 54:10, 54:19
**blue** [3] - 8:8, 8:12, 8:13
**booked** [1] - 65:14
**BOSCO** [3] - 1:21, 27:1, 27:23
**Bosco** [3] - 3:9, 27:2, 29:8
**Bosco's** [1] - 30:4
**Brian** [2] - 2:10, 3:19
**brief** [4] - 26:18, 29:22, 39:9, 39:17
**briefing** [1] - 28:18
**bring** [1] - 28:10
**broad** [1] - 48:4
**broad-brush** [1] - 48:4
**broader** [2] - 16:11, 43:4
**brush** [1] - 48:4
**bunch** [2] - 47:16, 48:9
**burden** [2] - 29:22, 30:3
**business** [8] - 17:6, 18:12, 18:20, 18:23, 32:19, 33:9, 33:10, 41:8
**buying** [1] - 36:4
**BY** [1] - 1:16

**C**

**calculated** [1] - 15:2
**calibrate** [1] - 50:23
**Callahan** [24] - 3:16, 8:16, 8:21, 15:16, 15:24, 17:13, 22:8, 31:25, 32:5, 34:14, 36:18, 37:3, 39:7, 45:15, 53:19, 53:22,

55:10, 55:14, 56:9, 58:21, 61:21, 65:20, 66:7, 66:18
**CALLAHAN** [29] - 2:5, 8:19, 15:23, 17:15, 31:24, 32:4, 33:22, 34:21, 35:2, 39:8, 45:14, 53:21, 54:8, 54:15, 55:13, 56:10, 58:22, 59:18, 59:21, 60:9, 61:23, 62:10, 62:19, 62:23, 63:6, 63:13, 65:19, 66:8, 66:18
**cannot** [4] - 12:18, 14:6, 30:14, 46:22
**capturing** [1] - 22:25
**careful** [1] - 24:19
**Case** [2] - 1:5, 67:8
**case** [27] - 5:13, 8:4, 8:11, 16:22, 17:9, 21:1, 25:10, 26:18, 27:24, 29:7, 30:1, 31:10, 31:11, 32:22, 33:10, 39:15, 42:12, 43:22, 44:1, 44:4, 44:9, 45:2, 46:8, 46:14, 64:18, 65:3, 65:15
**CASTLE** [2] - 67:3, 67:19
**catch** [1] - 47:5
**catching** [1] - 51:21
**caught** [3] - 48:22, 49:8, 53:9
**caused** [1] - 16:3
**caution** [1] - 24:18
**certain** [2] - 19:23, 41:7
**certainly** [4] - 14:20, 25:21, 30:9, 62:7
**Certified** [2] - 67:4, 67:6
**certify** [1] - 67:5, 67:12
**challenge** [1] - 38:16
**change** [1] - 28:11
**changing** [1] - 28:11
**charted** [1] - 31:9
**chosen** [1] - 42:22
**circuit** [1] - 34:2
**circumstances** [1] - 38:23
**cited** [3] - 16:22, 26:18, 30:1
**claim** [72] - 4:18, 6:4, 6:6, 6:7, 6:11, 7:4, 7:7, 7:24, 8:6, 8:8, 8:9, 8:10, 8:12, 9:2, 9:8, 9:19, 9:22, 10:7,

10:12, 10:14, 10:15, 10:16, 10:25, 11:2, 12:5, 14:4, 14:7, 14:9, 14:12, 14:24, 15:2, 16:24, 17:1, 18:10, 18:16, 20:17, 20:19, 21:4, 21:5, 21:8, 21:13, 21:15, 21:18, 22:11, 23:6, 23:7, 23:14, 24:17, 24:20, 24:22, 31:6, 46:23, 47:8, 54:14, 55:22, 56:5, 56:12, 56:20, 57:1, 57:2, 57:8, 57:12, 57:15, 57:18, 57:19, 58:14, 58:24, 60:18, 60:19, 60:25, 62:8, 62:21
**claimed** [1] - 6:1
**claiming** [2] - 60:20, 60:21
**claims** [11] - 5:17, 5:25, 11:9, 15:3, 16:5, 16:8, 16:21, 18:25, 56:13, 59:3, 60:25
**clean** [2] - 32:14, 33:4
**clear** [14] - 6:10, 9:7, 11:9, 11:14, 12:7, 15:7, 16:20, 27:4, 36:20, 36:21, 44:19, 45:18, 53:12
**clearer** [1] - 65:7
**clearly** [1] - 16:25
**Clerk** [1] - 67:18
**close** [2] - 10:22, 29:12
**closer** [1] - 10:14
**closing** [1] - 35:8
**co** [1] - 3:15
**co-counsel** [1] - 3:15
**colleague** [1] - 3:6
**colleagues** [1] - 65:22
**combination** [1] - 29:14
**combine** [1] - 26:16, 26:22
**Comcast** [1] - 38:15
**coming** [1] - 66:3
**comment** [2] - 46:2, 46:13
**communicated** [1] - 15:8
**communication** [1] - 12:24
**communications** [2] - 18:2, 18:5
**COMMUNICATIONS** [2] - 1:3, 67:9
**community** [1] - 15:20

**company's** [1] - 39:13
**comparable** [1] - 43:13
**competition** [8] - 14:18, 15:3, 16:4, 16:8, 16:22, 16:24, 18:17, 18:25
**complaining** [1] - 7:15
**complaint** [1] - 13:8
**complaints** [1] - 20:7
**conceded** [1] - 44:12
**concedes** [1] - 39:12
**conclusion** [2] - 41:4, 44:13
**confidential** [5] - 26:2, 27:16, 28:20, 29:24, 30:18
**conflicts** [1] - 56:7
**confused** [1] - 27:15
**connection** [3] - 41:6, 43:25, 51:3
**connects** [1] - 44:7
**consider** [2] - 54:11, 64:19
**considered** [6] - 28:24, 36:23, 51:7, 51:15, 54:5, 54:20
**consistent** [2] - 14:4, 52:19
**consisting** [1] - 67:14
**constitute** [2] - 18:9, 37:20
**constitutes** [1] - 37:15
**construction** [50] - 4:19, 5:24, 6:22, 7:4, 7:7, 8:9, 8:11, 9:3, 9:8, 9:19, 9:22, 10:7, 10:14, 11:2, 12:19, 13:21, 13:23, 14:12, 19:12, 21:5, 21:8, 21:13, 22:11, 23:14, 24:17, 45:19, 47:8, 48:15, 48:16, 48:18, 49:11, 49:12, 52:10, 52:19, 53:7, 54:14, 55:2, 55:21, 56:1, 56:8, 56:11, 58:12, 58:24, 61:3, 61:9, 62:9, 62:11, 62:22, 63:1, 64:4
**construe** [6] - 12:5, 45:19, 45:21, 63:11, 63:17, 63:20
**construed** [6] - 7:25, 10:17, 20:19, 21:15, 24:22, 61:25
**contend** [1] - 28:23
**contentions** [2] - 27:11, 31:10
**contest** [1] - 27:5

**contesting** [1] - 29:17
**context** [5] - 19:25, 20:22, 23:2, 23:12, 23:24
**context-dependent** [4] - 20:22, 23:2, 23:12, 23:24
**continued** [1] - 2:1
**conversation** [1] - 4:13
**conversations** [1] - 4:8
**copy** [1] - 67:15
**cornerstone** [1] - 32:25
**correct** [17] - 4:25, 11:22, 24:2, 24:8, 25:14, 26:4, 31:23, 32:1, 33:21, 33:23, 50:18, 53:20, 54:8, 54:16, 55:13, 55:14, 64:8
**correctly** [1] - 34:10
**CORROON** [1] - 1:16
**cost** [1] - 36:16
**could-have-been-raised** [1] - 30:22
**Counsel** [1] - 2:8
**counsel** [3] - 1:22, 3:1, 3:15
**counterclaim** [1] - 65:3
**counterclaims** [1] - 64:21
**COUNTY** [1] - 67:3
**County** [1] - 67:19
**couple** [3] - 3:17, 4:1, 39:9
**COURT** [82] - 1:1, 3:1, 3:10, 3:20, 6:12, 6:25, 8:15, 8:23, 10:9, 13:3, 13:12, 14:2, 15:14, 16:16, 17:2, 17:13, 17:19, 19:18, 20:5, 20:13, 21:10, 21:17, 22:7, 23:4, 23:16, 24:5, 24:9, 24:14, 25:6, 25:16, 25:25, 26:6, 26:23, 27:13, 29:3, 30:11, 32:2, 33:14, 34:13, 34:24, 35:14, 36:25, 39:6, 40:15, 47:4, 48:21, 50:10, 50:16, 51:10, 52:5, 52:13, 53:8, 53:17, 53:24, 54:10, 54:17, 55:10, 55:15, 56:9, 56:23, 58:16, 58:21, 59:16, 59:20, 59:24,

61:4, 61:21, 62:6, 62:14, 62:20, 63:1, 63:11, 63:16, 63:20, 63:23, 64:3, 64:9, 65:10, 65:25, 66:10, 66:17, 66:20
**Court** [4] - 30:6, 38:17, 66:14, 67:18
**Court's** [15] - 5:23, 6:22, 45:19, 46:2, 48:16, 48:18, 49:12, 52:19, 53:7, 55:2, 56:1, 56:7, 58:23, 61:2, 65:21
**covered** [1] - 12:4
**critical** [1] - 37:6
**cross** [3] - 24:11, 38:19, 40:9
**Cross** [1] - 25:2
**cross-examination** [1] - 40:9
**cross-examine** [1] - 24:11
**Cross-talk** [1] - 25:2
**crystal** [2] - 11:13, 45:18
**CSR** [1] - 67:22
**cumulative** [1] - 60:25
**cumulatively** [1] - 60:21
**customer** [1] - 42:3
**customers** [2] - 17:23, 59:2
**cut** [1] - 12:1

**D**

**damages** [17] - 15:1, 15:2, 16:6, 16:7, 16:10, 17:4, 17:10, 39:19, 41:3, 58:16, 58:18, 59:9, 59:18, 59:25, 60:4, 60:8, 60:23
**date** [3] - 41:10, 41:20, 43:12
**Daubert** [14] - 3:24, 4:8, 4:14, 4:15, 5:15, 19:2, 19:16, 31:16, 31:17, 31:18, 38:18, 40:6, 40:11, 45:8
**Dave** [1] - 8:21
**DAVID** [3] - 1:17, 1:20, 2:5
**David** [14] - 3:6, 3:8, 3:15, 14:23, 15:23, 31:24, 32:5, 35:23, 45:14, 53:21, 55:14, 64:16, 65:19, 66:18

**deal** [4] - 8:17, 14:12, 17:25, 66:2
**dealing** [1] - 30:8
**deals** [1] - 19:10
**dealt** [2] - 19:19, 30:10
**Deanna** [2] - 67:4, 67:22
**debate** [1] - 60:19
**decision** [1] - 38:21
**declaration** [1] - 28:21
**Defendant** [3] - 1:7, 2:8, 6:18
**defendant** [3] - 7:13, 29:10, 65:17
**defendants** [1] - 24:18
**defenses** [1] - 29:16
**definite** [1] - 43:12
**definition** [2] - 10:1, 22:21
**Delaware** [3] - 16:8, 16:20, 67:19
**DELAWARE** [2] - 1:2, 67:2
**deleted** [1] - 48:20
**denied** [6] - 9:6, 10:6, 14:14, 14:16, 19:1, 31:14
**deny** [7] - 4:10, 10:4, 24:15, 30:13, 61:4, 64:10
**denying** [3] - 14:2, 18:24, 22:16
**dependent** [6] - 19:25, 20:22, 23:2, 23:12, 23:24, 56:13
**deposed** [1] - 22:2
**deposition** [5] - 4:11, 15:10, 24:11, 28:20, 39:21
**derivatives** [1] - 43:9
**Desai** [8] - 3:9, 5:2, 13:3, 19:15, 24:9, 47:25, 56:25, 59:3
**DESAI** [26] - 1:17, 1:20, 5:1, 6:21, 7:16, 13:10, 13:20, 19:15, 19:21, 20:9, 20:16, 21:14, 47:24, 49:9, 50:12, 50:18, 55:6, 55:19, 57:7, 58:17, 60:15, 61:7, 63:19, 63:21, 63:24, 64:8
**detailed** [3] - 16:13, 17:16, 39:3
**detection** [6] - 19:24, 20:21, 22:1, 23:1, 23:11, 23:23
**device** [31] - 4:16, 4:22, 5:7, 5:10, 5:18, 5:25, 6:1, 6:7, 6:8,

6:14, 6:23, 7:1, 7:11, 7:18, 7:20, 8:2, 9:15, 9:24, 12:8, 13:6, 13:17, 19:9, 19:14, 20:23, 22:13, 22:17, 22:19, 22:23, 29:13, 63:25
**devices** [2] - 6:23, 63:25
**DI** [3] - 4:9, 14:15, 45:6
**dictated** [1] - 48:24
**dictation** [1] - 51:17
**difference** [5] - 5:3, 7:16, 8:5, 56:16, 60:8
**different** [16] - 6:2, 6:8, 7:15, 12:10, 13:9, 13:10, 13:13, 20:22, 24:10, 25:10, 31:1, 32:16, 52:4, 57:17, 58:9, 64:1
**differing** [1] - 42:1
**difficulty** [1] - 44:12
**diligent** [1] - 30:1
**direct** [3] - 35:5, 37:21, 42:13
**Direct** [5] - 38:2, 38:4, 38:8, 41:2, 42:8, 43:19, 43:20, 44:4
**directed** [1] - 36:8
**disagree** [1] - 56:25
**disclosed** [1] - 31:6
**discoverable** [1] - 29:25
**discuss** [1] - 4:4
**discussed** [2] - 29:8, 30:2
**discussing** [1] - 6:13
**discussions** [2] - 4:19, 39:22
**disguised** [1] - 40:13
**display** [3] - 5:10, 11:10, 11:12
**displays** [1] - 7:21
**dispute** [9] - 9:21, 9:23, 18:8, 18:14, 19:13, 22:18, 57:8
**disputed** [2] - 14:20, 58:20
**disputes** [1] - 10:4
**distinction** [1] - 28:12
**distinguishable** [1] - 29:8
**distracted** [1] - 19:6
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 67:18
**docket** [3] - 9:12, 9:16, 11:19
**doctrine** [3] - 53:3,

53:5, 54:6
**documents** [6] - 26:2, 27:16, 28:18, 28:22, 29:24, 30:18
**DOE** [5] - 53:15, 54:9, 55:8, 55:9, 55:11
**done** [5] - 21:16, 33:1, 33:21, 62:3, 62:4
**double** [1] - 65:14
**down** [16] - 14:24, 15:21, 33:18, 34:7, 35:21, 37:6, 37:22, 37:24, 40:4, 41:12, 42:16, 43:21, 50:21, 51:1, 59:5
**Dr** [66] - 4:15, 5:15, 7:14, 7:17, 7:25, 8:7, 10:11, 10:15, 11:9, 11:15, 13:15, 14:3, 14:7, 19:17, 19:22, 24:10, 24:19, 31:19, 32:7, 32:12, 32:23, 34:5, 34:15, 34:25, 37:25, 38:10, 38:21, 39:5, 39:16, 39:17, 39:20, 39:22, 40:18, 40:25, 41:4, 41:11, 41:15, 42:10, 42:22, 43:16, 43:20, 43:23, 44:2, 44:7, 44:17, 44:20, 45:18, 45:23, 45:24, 46:10, 46:11, 47:6, 47:14, 47:23, 47:25, 48:14, 50:25, 51:4, 51:14, 52:17, 54:2, 55:1, 55:24, 56:3, 61:10, 61:15
**Duff** [19] - 32:6, 32:15, 33:5, 33:15, 33:17, 35:16, 35:24, 35:25, 36:10, 36:13, 36:19, 36:21, 37:1, 37:11, 37:17, 39:12, 41:5, 41:24, 42:23
**during** [5] - 57:14, 58:4, 58:6, 58:25, 65:8

**E**

**e.g** [1] - 42:2
**easy** [3] - 19:4, 19:6, 62:5
**effectively** [1] - 40:8
**efficient** [1] - 65:16
**efforts** [1] - 16:12
**eight** [3] - 26:13, 26:17, 27:15
**either** [1] - 21:8
**element** [2] - 56:12,

59:15
**elements** [1] - 56:16
**eliminating** [1] - 13:22
**ELLIOT** [5] - 21:24,
51:25, 52:8, 52:23,
53:10
**ELLIOTT** [1] - 2:6
**Elliott** [1] - 3:16
**emphasized** [1] - 18:2
**employee** [1] - 18:1
**enabled** [1] - 60:5
**enables** [1] - 60:1
**Enterprises** [1] -
67:23
**entire** [5] - 17:9, 32:8,
33:9, 33:10, 33:12
**entirely** [2] - 32:16,
33:2
**entirety** [3] - 32:18,
39:13, 59:8
**entitle** [1] - 60:3
**entitled** [1] - 34:20
**equivalents** [3] - 53:4,
53:6, 54:6
**erased** [3] - 46:4,
46:7, 49:23
**ergo** [1] - 11:6
**ESQ** [11] - 1:16, 1:17,
1:17, 1:20, 1:20,
1:21, 2:3, 2:5, 2:6,
2:6, 2:7
**essence** [1] - 23:21
**essential** [1] - 52:12
**Essentiv** [1] - 40:21
**estopped** [2] - 27:6,
27:19
**estoppel** [4] - 24:24,
27:17, 30:19, 31:13
**evidence** [20] - 15:6,
15:7, 15:8, 16:21,
17:5, 17:8, 18:1,
18:4, 28:5, 28:10,
28:12, 28:14, 28:17,
29:15, 29:24, 34:17,
34:25, 35:3, 38:6,
65:5
**exact** [4] - 13:1, 22:24,
29:11, 29:12
**exactly** [3] - 8:4,
13:14, 45:21
**examination** [1] - 40:9
**examine** [1] - 24:11
**example** [5] - 5:8, 8:7,
35:4, 47:10, 57:11
**examples** [2] - 5:21,
21:11
**except** [1] - 55:8
**exception** [1] - 47:13
**exclude** [7] - 5:16,
7:23, 40:17, 44:25,

49:13, 50:13, 50:17
**excluded** [3] - 42:15,
44:18, 44:24
**Exhibit** [1] - 37:14
**exhibit** [1] - 5:22
**existence** [1] - 31:4
**expectation** [1] -
18:20
**expectations** [1] -
18:23
**experience** [1] - 50:20
**expert** [15] - 4:9, 4:12,
10:2, 15:2, 16:2,
16:9, 17:3, 17:10,
39:20, 40:14, 40:25,
60:9, 60:10, 60:11
**expiration** [1] - 43:12
**explain** [3] - 5:4,
20:14, 57:5
**explained** [5] - 38:24,
48:10, 51:14, 52:17,
55:1
**explaining** [1] - 50:19
**explains** [3] - 17:25,
37:13, 37:25
**explanation** [1] - 51:5
**explicit** [1] - 48:17
**explicitly** [3] - 5:19,
29:21, 60:25
**extent** [1] - 54:18
**extraction** [5] - 19:25,
20:21, 23:2, 23:11,
23:23

## F

**fact** [19] - 5:6, 5:8,
5:12, 7:3, 8:3, 8:9,
14:20, 16:1, 16:20,
17:2, 17:22, 18:19,
24:6, 24:16, 28:9,
37:7, 37:9, 46:23,
59:13
**factor** [1] - 38:12
**factors** [3] - 36:24,
42:18, 46:19
**facts** [13] - 18:15,
28:2, 29:9, 35:7,
35:12, 38:23, 42:11,
43:22, 43:25, 44:3,
44:9, 45:1, 45:3
**factual** [12] - 4:18,
4:21, 7:12, 7:13,
9:23, 10:4, 18:8,
22:12, 22:14, 22:18,
40:2, 46:14
**factually** [1] - 24:21
**failure** [1] - 15:1
**failure)** [1] - 16:15

**fall** [3] - 20:19, 21:14,
23:5
**falls** [1] - 24:21
**Farnan** [1] - 3:13
**FARNAN** [2] - 2:3,
3:12
**fashion** [1] - 46:18
**favors** [1] - 28:12
**feature** [5] - 19:24,
20:21, 23:1, 23:11,
23:23
**federal** [1] - 34:1
**few** [2] - 29:6, 50:23
**fight** [1] - 54:12
**figure** [5] - 9:18,
33:20, 59:24, 65:23
**FILED** [1] - 67:17
**filed** [3] - 20:4, 27:12,
31:11
**filing** [1] - 15:6
**finalizing** [1] - 17:24
**finally** [1] - 43:23
**fine** [3] - 11:2, 20:13,
66:10
**finger** [1] - 3:14
**FINGER** [1] - 2:2
**finished** [1] - 42:2
**first** [62] - 4:5, 5:23,
9:13, 13:11, 19:8,
29:7, 29:19, 35:24,
41:16, 45:11, 45:25,
46:5, 46:15, 46:25,
47:7, 47:9, 47:19,
48:17, 48:25, 49:7,
49:17, 49:21, 49:24,
50:11, 51:16, 51:18,
51:22, 52:20, 54:20,
55:4, 55:25, 56:2,
56:11, 56:14, 56:21,
57:14, 57:25, 58:8,
59:4, 59:6, 59:15,
59:23, 61:12, 61:16,
61:19, 61:20, 61:25,
62:1, 62:6, 62:12,
62:15, 62:24, 63:2,
63:4, 63:8, 63:9,
63:14, 63:16, 64:4,
64:7
**fit** [1] - 30:3
**five** [3] - 37:6, 39:16,
58:8
**fix** [1] - 62:5
**flip** [1] - 10:8
**Fluence** [1] - 43:18
**Fluency** [10] - 35:5,
37:21, 38:2, 38:4,
38:7, 41:1, 42:8,
42:13, 43:20, 44:4
**focus** [2] - 32:3, 33:9
**focused** [1] - 51:22

**follow** [1] - 58:9
**followed** [1] - 42:17
**following** [1] - 40:23
**FOR** [1] - 1:2
**foregoing** [2] - 67:8,
67:14
**forgets** [1] - 47:11
**formula** [1] - 38:17
**forth** [1] - 40:19
**forward** [1] - 28:11
**four** [8] - 5:20, 17:16,
27:14, 27:16, 30:17,
58:25, 59:12, 63:10
**four-year** [1] - 58:25
**frankly** [2] - 40:8, 52:9
**Frazer** [1] - 15:11
**front** [5] - 44:14, 46:8,
57:20, 57:22, 63:22

## G

**game** [1] - 46:20
**gatekeeper** [1] - 40:12
**gauge** [1] - 42:24
**generate** [1] - 47:18
**generated** [3] - 41:6,
41:8, 41:18
**genuine** [3] - 18:7,
18:14, 18:18
**Georgia** [4] - 35:10,
38:11, 38:24, 39:4
**given** [4] - 16:17,
19:12, 34:18, 66:2
**glosses** [1] - 37:8
**GOTSHAL** [1] - 1:19
**Gotshal** [4] - 3:8,
14:23, 35:23, 64:16
**grant** [3] - 30:12,
30:24, 40:16
**granted** [1] - 31:14
**granting** [1] - 45:6
**grappled** [1] - 26:19
**great** [2] - 61:15,
65:24
**ground** [6] - 28:3,
28:6, 28:7, 28:12,
30:22
**grounds** [4] - 27:17,
27:20, 29:16, 30:19
**guess** [5] - 10:9,
19:11, 24:24, 47:22,
65:25
**guys** [3] - 54:12,
65:10, 66:12

## H

**hand** [1] - 30:24,

33:19
**hand-waving** [1] -
33:19
**handful** [1] - 30:16
**handle** [4] - 8:20,
8:22, 25:1, 25:4
**happy** [2] - 52:11,
63:21
**harm** [4] - 16:3, 16:21,
16:25, 17:3
**Healthcare** [1] - 14:25
**healthcare** [2] - 15:9,
18:6
**hear** [8] - 8:16, 9:1,
16:16, 20:14, 26:24,
26:25, 47:4, 65:17
**heard** [2] - 40:16,
67:10
**hearing** [4] - 9:11,
11:17, 40:23, 64:23
**heart** [3] - 37:10, 38:4,
58:23
**held** [1] - 42:5
**help** [1] - 9:18
**helping** [1] - 12:12
**hereby** [1] - 67:5
**hesitate** [1] - 65:12
**highlighting** [1] -
39:10
**hold** [2] - 20:5, 48:21
**holds** [1] - 18:18
**Honor** [82] - 3:4, 3:13,
5:1, 8:18, 8:20, 8:22,
9:1, 11:8, 11:18,
11:21, 12:7, 12:11,
12:12, 14:22, 15:23,
16:14, 16:19, 17:16,
17:18, 19:15, 20:2,
22:9, 22:18, 24:13,
25:15, 25:20, 25:24,
26:5, 26:12, 27:1,
27:23, 29:5, 31:24,
32:1, 32:4, 33:3,
33:23, 34:3, 34:10,
34:22, 35:2, 35:9,
35:22, 35:25, 37:5,
37:8, 38:15, 38:20,
39:2, 39:8, 40:5,
40:8, 45:14, 45:17,
46:2, 46:16, 46:21,
47:2, 47:24, 50:6,
52:8, 52:9, 53:21,
54:16, 55:6, 55:14,
55:19, 56:10, 57:20,
58:22, 59:19, 60:15,
61:23, 61:24, 62:11,
63:7, 63:19, 64:15,
65:19, 66:9, 66:16,
66:19
**Honor's** [6] - 9:4, 9:10,

22:15, 56:11, 58:12, 61:8
**Honorable** [1] - 1:12
**Hospital** [5] - 15:20, 17:6, 18:3, 18:13, 18:21
**hugely** [1] - 46:19
**hundredth** [2] - 56:18, 59:14
**hypothetical** [4] - 41:9, 41:19, 43:5, 43:15

**I**

**i.e** [1] - 42:12
**I401** [1] - 30:12
**idea** [1] - 60:22
**identified** [2] - 17:23, 27:10
**ignoring** [1] - 63:4
**important** [6] - 36:7, 36:11, 37:7, 38:2, 39:18, 60:5
**impromptu** [1] - 9:18
**improper** [1] - 8:10
**IN** [2] - 1:1, 1:2
**inadmissible** [5] - 28:22, 28:25, 32:9, 32:15, 32:24
**inappropriate** [1] - 18:16
**INC** [2] - 1:3, 67:10
**include** [2] - 37:1, 37:2
**included** [3] - 37:4, 43:7, 64:5
**includes** [4] - 16:12, 23:10, 36:5, 42:5
**including** [1] - 36:24
**inconsistent** [2] - 54:13, 62:21
**incorporate** [1] - 40:22
**increase** [1] - 42:17
**indeed** [1] - 32:12
**indication** [1] - 42:6
**individual** [1] - 30:20
**inexplicably** [1] - 51:2
**infringe** [9] - 6:6, 23:7, 36:6, 48:12, 53:3, 59:1, 59:2, 59:12, 60:5
**infringed** [7] - 55:22, 56:20, 57:1, 57:9, 57:16, 60:19
**infringement** [11] - 9:14, 9:20, 10:21, 11:7, 13:7, 13:18,

34:19, 41:3, 42:12, 58:7, 58:14
**infringes** [1] - 54:5
**infringing** [10] - 47:2, 48:6, 48:9, 48:11, 50:2, 50:7, 60:14, 61:9, 62:16, 62:17
**initial** [2] - 40:3, 50:20
**initiated** [2] - 36:2, 49:3
**injury** [1] - 17:10
**input** [10] - 5:18, 5:25, 6:7, 10:17, 11:24, 12:7, 12:21, 19:14, 20:23, 63:25
**insignificant** [1] - 39:23
**instances** [1] - 16:5
**instead** [1] - 46:12
**instruct** [1] - 4:10
**instruction** [1] - 35:9
**instructions** [1] - 35:11
**instructive** [1] - 27:24
**intellectual** [2] - 39:14, 42:5
**intended** [1] - 47:8
**intention** [1] - 49:15
**interested** [1] - 65:1
**interfered** [1] - 18:23
**interference** [1] - 15:5
**internet** [1] - 51:3
**interpretation** [4] - 14:5, 14:10, 14:11, 46:23
**interpreting** [2] - 5:17, 20:17
**interruption** [2] - 36:14, 51:9
**introduce** [1] - 25:4
**intuitive** [1] - 38:20
**invalidates** [1] - 31:6
**invalidity** [3] - 27:10, 28:3, 31:9
**involved** [1] - 43:10
**involves** [1] - 56:5
**involving** [2] - 35:16, 51:17
**IP** [3] - 37:1, 37:2, 43:7
**IPR** [14] - 25:19, 25:22, 26:10, 26:15, 27:12, 27:17, 27:22, 28:8, 29:17, 30:15, 30:17, 31:8, 31:10, 31:13
**ironically** [1] - 27:25
**irrelevant** [2] - 46:9, 65:5
**issue** [70] - 4:18, 4:21, 5:4, 5:5, 5:6, 5:8, 5:14, 6:13, 6:15, 7:1,

7:3, 7:4, 7:7, 7:10, 7:12, 7:13, 8:3, 8:9, 9:3, 9:8, 9:19, 9:20, 9:22, 10:3, 10:8, 15:10, 15:24, 16:18, 17:20, 18:19, 19:7, 22:12, 22:13, 22:14, 22:17, 24:6, 25:11, 26:19, 27:3, 32:11, 33:14, 33:16, 35:18, 38:22, 39:11, 39:15, 45:11, 45:17, 46:14, 50:4, 52:6, 52:12, 53:2, 53:19, 53:22, 54:1, 54:25, 55:11, 55:21, 58:16, 58:20, 60:23, 64:22, 65:2, 65:7, 65:9, 65:12, 66:13
**issued** [1] - 45:22
**issues** [14] - 14:20, 17:22, 19:3, 24:15, 24:16, 24:17, 25:9, 26:24, 35:16, 40:9, 52:3, 65:1, 65:6, 66:4
**itself** [1] - 41:20

**J**

**joined** [1] - 3:14
**Judge** [4] - 16:23, 28:2, 28:5
**judgment** [12] - 3:24, 9:6, 9:14, 14:17, 16:14, 18:15, 18:24, 22:17, 24:24, 28:24, 31:17, 45:8
**July** [2] - 41:8, 41:18
**jump** [1] - 27:3
**juror** [1] - 40:10
**jury** [3] - 5:12, 35:9, 46:8
**justification** [1] - 43:17

**K**

**keep** [1] - 49:16
**keeps** [2] - 36:18, 51:21
**KELLY** [1] - 2:3
**Kelly** [1] - 3:13
**ken** [1] - 40:10
**KEVIN** [1] - 2:6
**Kevin** [3] - 3:16, 8:21, 22:10
**kind** [4] - 20:16, 34:8, 40:12, 60:16

**knowledgeable** [1] - 28:22
**knows** [3] - 35:25, 37:8, 39:2
**Krauss's** [11] - 31:19, 32:7, 34:5, 34:22, 37:12, 41:15, 42:10, 43:20, 43:23, 44:17, 44:20

**L**

**lack** [1] - 36:17
**lacking** [1] - 44:8
**last** [5] - 9:17, 20:16, 49:22, 53:2, 63:4
**Latham** [1] - 3:15
**LATHAM** [1] - 2:5
**law** [4] - 16:20, 30:2, 40:22, 64:20
**lawsuit** [5] - 15:6, 15:13, 18:2, 18:6, 18:22
**LAYTON** [1] - 2:2
**layton** [1] - 3:13
**lead** [1] - 45:1
**least** [1] - 18:12
**leaves** [1] - 32:20
**led** [1] - 39:1
**left** [1] - 31:17
**legal** [1] - 40:20
**Lender** [1] - 64:16
**lender** [7] - 3:8, 11:21, 12:6, 14:23, 35:23, 39:11, 39:19
**LENDER** [7] - 1:20, 14:22, 16:19, 17:8, 35:22, 37:2, 64:15
**letter** [4] - 48:3, 50:14, 51:13, 66:11
**liability** [1] - 39:20
**license** [5] - 36:16, 43:4, 43:7, 43:10, 43:11
**licenses** [2] - 36:19, 36:21
**licensing** [1] - 33:7
**lifted** [1] - 64:17
**light** [1] - 4:24
**limine** [1] - 30:8
**limit** [1] - 40:12
**limited** [4] - 15:18, 16:5, 31:19, 43:11
**limited-term** [1] - 43:11
**line** [4] - 3:18, 10:23, 11:20
**lines** [1] - 9:12
**linked** [1] - 21:25

**literal** [1] - 53:7
**literally** [1] - 49:23
**LLC** [4] - 1:6, 40:21, 67:10, 67:23
**LLP** [3] - 1:16, 1:19, 2:5
**local** [2] - 61:13, 61:17
**locally** [1] - 62:3
**location** [7] - 6:9, 9:15, 12:9, 12:10, 19:14, 20:23, 64:1
**locations** [1] - 6:3
**log** [1] - 50:21
**look** [4] - 13:16, 15:19, 37:12, 54:23
**looked** [3] - 28:6, 32:13, 39:13
**looking** [1] - 63:3
**loose** [1] - 42:18
**lost** [8] - 17:6, 19:6, 31:21, 44:22, 46:4, 46:7, 48:8, 58:19
**Louisville** [1] - 14:25

**M**

**magic** [2] - 33:23, 34:4
**main** [1] - 33:14
**maintain** [1] - 55:9
**Manges** [1] - 3:8
**MANGES** [1] - 1:19
**Markman** [2] - 9:11, 11:17
**Maryellen** [1] - 1:12
**mass** [1] - 12:22
**material** [2] - 18:14, 18:19
**mathematical** [2] - 38:17, 39:2
**matter** [1] - 16:2
**mean** [9] - 10:10, 12:5, 17:3, 27:14, 46:2, 47:5, 55:21, 61:25, 62:7
**means** [1] - 52:18
**meant** [1] - 62:8
**MedLEE** [5] - 26:1, 27:3, 27:15, 27:18, 30:14
**meet** [1] - 14:10
**memory** [1] - 12:22
**mentioned** [1] - 64:18
**method** [1] - 59:2
**methods** [1] - 36:15
**middle** [3] - 51:9, 53:9, 53:11
**mike** [1] - 50:23
**mind** [1] - 4:6
**minimum** [1] - 34:20

**minutes** [1] - 50:23
**MModal** [37] - 2:8, 3:14, 5:9, 8:22, 14:6, 15:1, 15:19, 15:25, 17:5, 17:22, 17:25, 18:4, 18:11, 18:18, 20:4, 22:24, 24:25, 25:5, 27:4, 28:1, 28:18, 31:9, 31:25, 35:4, 35:5, 35:6, 37:7, 41:7, 41:14, 42:6, 43:3, 48:7, 50:8, 57:2, 65:20, 66:19
**MMODAL** [2] - 1:6, 67:10
**MModal's** [16] - 9:5, 9:13, 9:23, 15:9, 15:10, 21:21, 22:16, 22:19, 32:19, 33:11, 40:17, 41:24, 42:13, 45:12, 57:13, 57:23
**model** [4] - 46:3, 46:7, 47:18, 49:2, 49:6, 51:20, 51:24, 52:22, 53:25, 54:21, 55:5, 55:17
**modified** [1] - 57:4
**modify** [1] - 61:11
**modifying** [1] - 60:22
**moment** [1] - 36:7
**money** [1] - 35:4
**MOORE** [1] - 1:17
**moore** [1] - 3:6
**mooted** [1] - 4:17
**moreover** [1] - 18:11
**Moreover** [1] - 42:4
**most** [3] - 4:1, 27:9, 50:3
**MOTION** [3] - 1:9, 1:11, 67:16
**motion** [33] - 3:23, 4:8, 4:15, 4:21, 5:22, 9:5, 9:13, 10:4, 10:5, 14:3, 14:14, 16:13, 18:24, 19:2, 19:22, 20:1, 20:4, 22:16, 24:15, 30:6, 31:14, 32:20, 40:17, 45:6, 45:9, 45:10, 45:12, 54:7, 55:11, 61:3, 61:5, 64:10
**motions** [2] - 30:8, 40:20, 45:8, 64:11, 64:12
**motivation** [1] - 26:16
**motivations** [1] - 26:21
**move** [1] - 18:12
**moving** [1] - 54:9

**MR** [73] - 5:1, 6:21, 7:16, 8:18, 8:19, 8:25, 11:8, 13:10, 13:20, 14:22, 15:23, 16:19, 17:8, 17:15, 19:15, 19:21, 20:9, 20:16, 21:14, 22:9, 23:13, 24:2, 24:8, 24:13, 25:14, 25:20, 26:4, 26:11, 27:1, 27:23, 29:5, 31:24, 32:4, 33:22, 34:21, 35:2, 35:22, 37:2, 39:8, 45:14, 47:24, 49:9, 50:12, 50:18, 53:21, 54:8, 54:15, 55:6, 55:13, 55:19, 56:10, 57:7, 58:17, 58:22, 59:18, 59:21, 60:9, 60:15, 61:7, 61:23, 62:10, 62:19, 62:23, 63:6, 63:13, 63:19, 63:21, 63:24, 64:8, 64:15, 65:19, 66:8, 66:18
**MS** [7] - 3:3, 3:12, 21:24, 51:25, 52:8, 52:23, 53:10
**multiple** [6] - 5:20, 46:15, 55:23, 57:9, 60:20
**multitude** [1] - 43:8
**must** [7] - 10:17, 11:13, 19:13, 20:20, 21:16, 21:21, 64:6
**muster** [1] - 34:2, 40:6

**N**

**necessarily** [2] - 37:10, 58:19
**need** [6] - 23:16, 24:25, 27:18, 64:13, 66:1, 66:6
**needed** [1] - 9:20
**negotiate** [1] - 43:5
**negotiation** [3] - 41:10, 41:19, 43:15
**never** [6] - 7:19, 31:3, 47:12, 49:18, 60:24, 62:7
**nevertheless** [1] - 51:14
**NEW** [2] - 67:3, 67:18
**new** [2] - 58:7, 58:13
**next** [5] - 14:15, 14:17, 49:10, 61:18, 66:9
**no-speaker-specific-model** [1] - 53:25

**nobody** [1] - 33:20
**Noerr** [1] - 64:22
**Noerr-Pennington** [1] - 64:22
**nominal** [1] - 16:7
**non** [8] - 48:6, 48:9, 48:11, 50:2, 50:7, 61:9, 62:16, 62:17
**non-infringing** [8] - 48:6, 48:9, 48:11, 50:2, 50:7, 61:9, 62:16, 62:17
**none** [1] - 6:6
**Noreika** [1] - 1:12



**note** [1] - 29:20
**notes** [1] - 67:13
**nothing** [9] - 8:12, 12:16, 17:12, 28:17, 50:4, 56:6, 58:11, 61:2, 61:8
**notwithstanding** [1] - 59:13
**Nowak** [2] - 2:10, 3:19
**NUANCE** [2] - 1:3, 67:9
**Nuance** [26] - 3:5, 5:2, 9:2, 11:16, 14:13, 15:5, 15:8, 15:12, 18:1, 18:5, 18:13, 19:11, 26:25, 27:2, 28:13, 29:17, 29:21, 35:14, 35:23, 44:25, 46:11, 47:5, 47:25, 58:24, 60:12, 65:22
**Nuance's** [3] - 9:7, 10:5, 18:21
**Number** [1] - 67:9
**number** [10] - 9:12, 9:16, 11:19, 18:6, 26:21, 32:13, 34:7, 40:21, 44:1, 44:10

**O**

**O'Donahue** [1] - 25:4
**O'DONOHUE** [6] - 2:7, 25:14, 25:20, 26:4, 26:11, 29:5
**O'Donohue** [4] - 3:17, 25:7, 25:15, 29:4
**objectively** [2] - 64:21, 65:6
**obtain** [3] - 47:15, 49:5, 49:7

**obtained** [5] - 47:10, 47:11, 47:19, 51:23, 64:7
**obtaining** [2] - 49:16, 58:1
**obtains** [10] - 12:8, 47:1, 56:14, 56:19, 56:21, 59:7, 62:1, 62:12, 62:24, 63:3
**occurs** [1] - 48:19
**OF** [4] - 1:2, 1:9, 67:2, 67:3
**offered** [1] - 17:9
**offering** [2] - 7:17, 7:19
**offers** [1] - 43:16
**OFFICIALLY** [1] - 67:17
**offline** [1] - 65:22
**once** [4] - 55:23, 57:1, 57:16, 60:24
**one** [56] - 4:6, 4:9, 4:18, 12:2, 12:8, 12:22, 14:19, 19:3, 19:4, 19:5, 19:11, 22:8, 22:10, 25:11, 27:25, 28:1, 29:23, 30:12, 31:1, 31:25, 32:21, 33:11, 34:6, 34:11, 36:11, 45:13, 45:15, 46:4, 48:16, 49:17, 49:24, 51:7, 51:16, 52:25, 53:1, 53:15, 54:4, 54:11, 54:12, 54:20, 55:20, 56:2, 56:17, 56:18, 57:9, 57:14, 57:24, 59:3, 59:25, 60:4, 61:8, 62:16, 64:18, 65:16
**ongoing** [1] - 41:1
**opine** [1] - 34:15
**opined** [1] - 55:24
**opines** [1] - 40:25
**opining** [2] - 23:14, 24:20
**opinion** [16] - 6:5, 7:17, 7:19, 7:20, 8:10, 8:14, 10:11, 20:18, 31:19, 32:8, 40:17, 41:15, 42:14, 44:17, 44:20, 44:22
**opinions** [3] - 5:15, 44:23, 56:4
**opposite** [1] - 45:21
**opposition** [5] - 16:13, 17:17, 17:23, 26:18, 27:4
**order** [5] - 20:18, 21:14, 22:16, 23:7,

40:23
**original** [1] - 11:17
**OSSIM** [4] - 25:11, 30:25, 31:11
**output** [25] - 4:16, 4:22, 5:7, 5:10, 5:18, 6:1, 6:8, 6:14, 7:1, 7:11, 7:18, 7:20, 9:15, 9:23, 10:19, 11:5, 11:10, 11:24, 13:6, 13:17, 19:9, 22:13, 22:17, 22:19, 22:23
**outset** [1] - 41:22
**over-reading** [1] - 14:13
**overall** [2] - 36:9, 37:24
**overlap** [2] - 29:15, 29:18
**overt** [2] - 15:4, 18:9
**own** [1] - 34:5

**P**

**P.A** [1] - 2:2
**Pacific** [4] - 35:10, 38:11, 38:25, 39:4
**page** [7] - 9:10, 9:12, 11:19, 11:20, 17:16, 39:16
**pages** [1] - 67:15
**PALAPURA** [2] - 1:16, 3:3
**Palapura** [1] - 3:4
**papers** [1] - 3:24
**paragraph** [14] - 5:21, 6:5, 6:9, 20:10, 20:11, 50:1, 50:5, 50:16, 52:1, 52:6, 52:11, 53:11, 54:23, 55:8, 61:6, 64:10
**paragraphs** [15] - 7:23, 7:24, 23:9, 48:2, 48:6, 48:13, 52:3, 52:25, 53:14, 55:18, 56:4, 56:6, 56:24, 61:1, 61:5
**part** [37] - 4:22, 6:14, 6:17, 6:19, 7:2, 7:11, 10:10, 10:19, 11:5, 11:12, 12:17, 12:20, 12:23, 13:6, 13:17, 13:23, 13:25, 19:8, 19:10, 19:20, 19:21, 20:1, 20:3, 24:1, 24:3, 30:12, 30:13, 31:14, 31:15, 53:9, 53:11, 54:18, 55:8,

55:15, 57:25, 63:4
**particular** [10] - 8:2,
32:17, 47:1, 56:15,
56:19, 56:22, 59:7,
62:1, 62:13, 62:25
**particularly** [2] - 31:8,
41:21
**parties** [4] - 4:10,
5:24, 30:7
**parties'** [1] - 4:17
**parts** [2] - 12:23, 20:6
**party** [2] - 36:2, 41:6
**pass** [2] - 34:1, 40:6
**past** [1] - 48:24
**patent** [17] - 31:20,
31:22, 36:6, 37:23,
39:23, 40:19, 41:4,
42:9, 42:13, 43:12,
43:14, 43:19, 44:18,
44:21, 44:22, 44:24,
65:5
**patented** [2] - 35:18,
35:19
**Pennington** [1] -
64:22
**pennypack** [1] - 46:19
**people** [1] - 7:3
**per** [1] - 16:25
**percent** [35] - 36:12,
36:18, 37:6, 37:16,
37:20, 37:22, 37:24,
37:25, 38:6, 38:8,
38:9, 38:10, 41:1,
41:13, 41:14, 41:17,
41:23, 42:7, 42:17,
42:18, 42:19, 42:20,
42:22, 42:24, 43:2,
43:17, 43:18, 43:21,
43:24, 44:2, 44:5,
44:6, 44:10
**perfectly** [1] - 40:11
**perform** [3] - 20:20,
57:13, 57:18
**performed** [2] - 19:13,
58:9
**performing** [3] -
22:25, 23:1, 23:2
**performs** [1] - 58:13
**period** [3] - 58:25,
59:4, 59:9
**permission** [1] - 65:21
**perpetual** [1] - 43:10
**person** [6] - 4:12,
38:19, 51:8, 58:13,
60:1, 61:13
**perspective** [1] -
60:17
**petition** [2] - 27:12,
29:13
**petitioner** [2] - 26:20,

29:11
**Phelps** [19] - 32:7,
32:15, 33:5, 33:15,
33:17, 35:16, 35:25,
36:1, 36:10, 36:14,
36:19, 36:21, 37:1,
37:11, 37:17, 39:12,
41:5, 41:24, 42:23
**Phillips** [3] - 26:17,
42:25, 43:9
**phone** [1] - 4:3
**piece** [1] - 39:24
**place** [3] - 19:24,
20:25, 21:3
**plainly** [1] - 56:1
**plaintiff** [5] - 3:5, 6:16,
14:19, 16:17, 55:1
**Plaintiff** [2] - 1:4, 1:22
**plaintiff's** [4] - 4:7,
4:14, 24:23, 40:25
**plausible** [1] - 51:5
**point** [9] - 13:4, 29:19,
30:4, 33:24, 34:10,
41:17, 42:10, 60:16,
60:17
**points** [5] - 29:6, 34:4,
36:9, 43:3, 48:15
**Polish** [15] - 39:20,
39:22, 45:18, 45:23,
46:11, 47:6, 47:14,
47:25, 48:25, 50:25,
51:14, 52:17, 54:2,
55:1, 61:15
**Polish's** [3] - 48:14,
51:4, 56:3
**portion** [4] - 20:11,
39:15, 44:15, 53:12
**position** [11] - 8:1,
9:3, 9:7, 11:16, 13:1,
13:5, 20:15, 26:11,
57:13, 57:23, 58:15
**possibilities** [1] -
25:24
**possible** [1] - 49:24
**Potter** [2] - 3:4, 3:7
**POTTER** [1] - 1:16
**practicing** [1] - 59:15
**precision** [1] - 39:2
**predicate** [1] - 13:25
**prejudicial** [1] - 46:19
**prepared** [1] - 4:3
**presence** [1] - 35:12
**present** [3] - 9:22,
21:2, 67:7
**PRESENT** [1] - 2:9
**presentation** [5] -
19:25, 20:22, 23:3,
23:12, 23:24
**presentations** [1] -
38:3

**presented** [1] - 21:9
**press** [1] - 18:22
**pressed** [2] - 39:25
**pretty** [1] - 3:25
**prevent** [1] - 13:2
**previously** [3] - 19:1,
30:21, 40:19
**printed** [8] - 25:17,
25:21, 25:23, 26:1,
26:6, 26:8, 26:12,
31:4
**private** [2] - 4:8, 4:12
**probative** [1] - 43:14
**problem** [5] - 34:10,
44:6, 51:11, 51:12,
52:10
**proceeding** [1] - 27:22
**proceedings** [1] - 67:8
**process** [9] - 14:18,
15:4, 16:4, 16:9,
17:1, 18:10, 18:16,
18:25, 22:25
**processer** [1] - 12:21
**processor** [1] - 11:24
**product** [11] - 5:7,
7:18, 8:2, 21:22,
28:5, 33:12, 35:6,
42:2, 42:8, 42:13,
44:4
**products** [8] - 5:9, 6:6,
9:16, 33:13, 35:18,
35:20, 43:8, 43:9
**profile** [2] - 48:20,
49:22
**profitable** [1] - 35:6
**profits** [3] - 31:22,
44:22, 58:20
**property** [2] - 39:14,
42:5
**proposal** [2] - 66:2,
66:13
**proposed** [2] - 48:8,
48:9, 61:10
**proposing** [2] - 48:7,
61:11
**proprietary** [4] -
36:25, 39:24, 41:25,
42:4
**prove** [1] - 29:22
**providers** [1] - 18:7
**Prowse** [21] - 31:18,
32:12, 32:23, 34:15,
34:25, 37:19, 37:25,
38:10, 38:21, 39:5,
39:16, 39:17, 40:18,
40:25, 41:4, 41:11,
42:22, 43:16, 44:2,
44:7, 45:24
**PTAB** [3] - 26:15,
28:8, 28:15

**publication** [6] -
25:12, 25:18, 25:21,
25:23, 28:4, 31:5
**publications** [7] -
26:2, 26:7, 26:9,
26:13, 27:5, 27:10,
27:16
**pull** [1] - 57:19
**pulling** [1] - 20:6
**punitive** [1] - 16:7
**purports** [1] - 41:11
**purpose** [1] - 32:17
**purposes** [4] - 10:7,
20:18, 33:7, 33:8
**pursuant** [3] - 9:25,
22:20, 46:24
**pushing** [1] - 11:1
**put** [8] - 28:8, 28:15,
33:6, 34:17, 34:25,
35:3, 50:14, 65:4

## Q

**qualitative** [2] - 36:23,
38:1
**quantified** [3] - 16:2,
16:10, 17:11
**quantify** [2] - 16:6,
17:4
**quantitative** [2] -
36:23, 38:5
**quantum** [1] - 59:21
**questions** [2] - 4:2,
47:3
**quote** [2] - 5:23, 16:25

## R

**raise** [1] - 18:14
**raised** [11] - 18:18,
25:18, 25:22, 26:10,
26:14, 27:22, 30:15,
30:17, 30:21, 30:22,
31:8
**raising** [1] - 65:2
**random** [1] - 36:1
**ranging** [1] - 43:1
**rate** [2] - 41:12, 41:13
**rates** [1] - 43:1
**rather** [2] - 24:20,
65:15
**rationale** [1] - 43:16
**reach** [1] - 41:4
**reaching** [1] - 44:13
**read** [9] - 9:10, 11:18,
15:17, 17:19, 20:11,
21:10, 49:10, 62:8,
63:21

**reading** [5] - 14:13,
51:12, 54:25, 56:24,
61:24
**real** [1] - 43:16
**realized** [1] - 19:19
**really** [6] - 23:9, 28:11,
46:20, 58:11, 60:7,
65:2
**realm** [1] - 25:23
**reason** [8] - 5:15, 9:5,
10:6, 22:13, 26:15,
29:1, 31:7, 51:2
**reasonable** [11] -
18:20, 31:20, 32:10,
32:25, 34:18, 35:10,
40:18, 41:2, 42:14,
44:17, 44:21
**reasonably** [5] - 26:9,
26:14, 26:20, 27:7,
31:8
**reasoning** [1] - 18:18
**reasons** [3] - 42:14,
44:16, 55:23
**rebuttal** [1] - 5:21
**receives** [1] - 7:21
**recited** [1] - 44:3
**recognition** [37] -
4:23, 6:2, 6:14, 6:18,
6:19, 6:23, 7:12,
9:25, 10:1, 10:18,
10:20, 11:4, 11:6,
11:12, 11:23, 12:2,
12:17, 12:21, 13:6,
13:22, 13:23, 20:20,
20:25, 21:12, 21:20,
22:20, 22:22, 23:8,
23:10, 23:25, 24:1,
24:3, 47:17, 57:4,
62:3, 64:2
**recognize** [7] - 6:16,
6:17, 6:24, 6:25,
13:24, 57:4, 58:4
**recognized** [3] - 7:21,
12:9, 12:13
**recognizes** [6] - 5:7,
5:11, 7:18, 8:3, 14:1,
63:9
**recognizing** [5] - 7:22,
21:25, 22:2, 22:3,
58:2
**record** [1] - 35:12
**rectifiable** [1] - 46:21
**reference** [4] - 25:12,
25:17, 31:2, 31:5
**references** [4] - 26:17,
27:18, 30:16, 30:20
**referring** [3] - 36:19,
49:14, 49:19
**reflected** [1] - 49:11
**reflects** [1] - 43:18

**regard** [1] - 41:25
**rejected** [1] - 38:18
**relate** [1] - 45:10
**related** [2] - 40:18, 55:20
**relatedness** [1] - 34:2
**relates** [2] - 4:16, 44:20
**relating** [1] - 18:22
**relation** [1] - 42:7
**relatively** [1] - 62:5
**relevant** [3] - 58:18, 58:19, 59:17
**reliability** [1] - 41:16
**reliable** [1] - 41:21
**reliance** [1] - 33:15
**relied** [4] - 26:3, 32:16, 33:6, 42:23
**rely** [1] - 28:1
**relying** [1] - 36:20
**remade** [1] - 30:23
**remainder** [1] - 59:11
**remaining** [1] - 59:9
**remains** [1] - 5:12
**remember** [1] - 4:20
**reminds** [1] - 19:1
**remote** [60] - 5:18, 9:24, 10:17, 11:3, 11:6, 11:13, 12:3, 12:18, 12:24, 19:7, 19:10, 19:12, 20:2, 21:19, 21:22, 22:19, 45:11, 45:25, 46:5, 46:15, 47:7, 47:19, 48:17, 48:25, 49:17, 49:21, 49:25, 51:18, 52:20, 55:4, 55:16, 56:12, 56:13, 57:15, 57:25, 58:5, 59:4, 59:6, 59:15, 61:14, 61:16, 61:18, 61:19, 61:20, 61:25, 62:7, 62:8, 62:11, 62:14, 62:18, 63:2, 63:7, 63:12, 63:13, 63:15, 63:17, 64:4, 64:5, 64:6
**remotely** [5] - 20:25, 21:3, 21:7, 21:16, 62:4
**repeatedly** [1] - 18:1
**replace** [1] - 22:23
**report** [19] - 5:19, 5:21, 10:23, 20:6, 32:7, 34:23, 35:25, 36:1, 36:2, 37:12, 40:14, 41:5, 41:8, 41:18, 42:24, 44:14, 48:14, 60:11
**reported** [1] - 67:7

**Reporter** [2] - 67:5, 67:6
**representation** [1] - 57:3
**representatives** [1] - 3:18
**require** [7] - 5:17, 5:25, 8:6, 11:10, 15:4, 16:21, 56:17
**required** [4] - 26:16, 39:3, 41:16
**requirement** [1] - 30:2
**requirements** [1] - 21:6
**requires** [9] - 6:7, 8:6, 8:8, 10:13, 10:16, 10:25, 14:8, 16:25, 17:3
**requiring** [1] - 19:23
**requisite** [1] - 18:9
**resolution** [1] - 64:25
**resolved** [1] - 9:5
**respect** [6] - 4:20, 16:3, 16:10, 16:14, 29:23, 52:10
**respond** [1] - 29:4
**response** [4] - 16:17, 29:6, 35:15, 39:6
**rest** [8] - 9:24, 10:18, 11:4, 13:16, 22:19, 56:16, 64:1, 66:21
**result** [1] - 43:5
**results** [1] - 23:25
**retained** [1] - 56:4
**revenue** [2] - 36:12, 37:15
**revenues** [2] - 37:18, 38:7
**reviewed** [1] - 3:23
**revised** [1] - 44:5
**revises** [1] - 41:13
**Richards** [1] - 3:13
**RICHARDS** [1] - 2:2
**rights** [1] - 43:7
**rolling** [1] - 50:24
**roughly** [1] - 37:4
**royalty** [18] - 31:20, 32:10, 32:25, 34:16, 34:18, 35:11, 35:16, 36:15, 40:18, 41:1, 41:3, 41:18, 41:23, 42:14, 43:1, 44:17, 44:21, 45:2
**rule** [2] - 4:7, 53:18
**ruling** [8] - 9:10, 14:14, 22:24, 40:20, 40:24, 44:19, 44:24, 45:5

**S**

**Sandra** [2] - 2:10, 3:18
**scenario** [6] - 48:18, 49:13, 49:19, 50:25, 51:6, 56:2
**schedule** [1] - 65:13
**scope** [9] - 6:3, 6:11, 14:8, 20:19, 21:15, 21:18, 23:6, 24:20, 53:7
**screen** [1] - 12:1
**SEALED** [1] - 67:17
**search** [1] - 30:1
**second** [14] - 9:11, 19:10, 19:21, 20:1, 29:1, 29:20, 41:23, 51:16, 54:20, 55:2, 56:17, 56:24, 57:20, 59:13
**see** [6] - 11:25, 31:7, 44:6, 47:3, 53:19, 65:22
**seek** [1] - 27:6
**seeking** [2] - 5:16, 7:23
**seem** [6] - 25:9, 33:16, 41:21, 54:13, 62:21, 65:16
**segments** [1] - 22:25
**select** [1] - 18:6
**selling** [1] - 35:5
**send** [1] - 66:11
**sense** [1] - 42:24
**sentence** [3] - 20:16, 22:24, 49:10
**separate** [2] - 13:16, 13:18
**separately** [1] - 25:9
**September** [3] - 1:13, 67:11, 67:20
**server** [3] - 8:8, 8:11, 8:13
**services** [1] - 42:1
**session** [63] - 19:7, 19:10, 19:12, 20:3, 45:11, 46:6, 46:25, 47:20, 48:17, 48:24, 48:25, 49:2, 49:8, 49:17, 49:20, 49:21, 49:25, 51:7, 51:17, 51:18, 51:19, 52:20, 52:21, 53:1, 53:15, 54:4, 54:11, 54:12, 55:4, 55:16, 56:3, 56:12, 56:13, 57:15, 57:25, 58:5, 58:7, 59:5, 59:6, 59:14, 59:15, 61:13, 61:14,

61:16, 61:17, 61:18, 61:19, 61:25, 62:7, 62:11, 62:18, 63:2, 63:8, 63:12, 63:13, 63:15, 63:17, 63:18, 63:24, 64:4, 64:5, 64:6
**sessions** [9] - 45:25, 46:15, 47:7, 49:16, 51:15, 52:18, 54:5, 54:19, 56:6
**set** [3] - 28:2, 40:19, 40:22
**setting** [1] - 56:3
**setup** [1] - 50:19
**seven** [2] - 41:9, 41:19
**Shorthand** [2] - 67:5, 67:6
**shorthand** [2] - 67:7, 67:13
**show** [3] - 21:1, 29:24, 31:2
**showed** [2] - 38:12, 38:25
**shown** [1] - 18:11
**shows** [1] - 37:13
**side** [1] - 10:8
**sides** [3] - 7:5, 9:21, 10:3
**SIGNED** [1] - 67:17
**significantly** [1] - 38:14
**silly** [1] - 60:17
**similar** [3] - 18:17, 28:2, 54:25
**simpler** [1] - 57:6
**simply** [1] - 49:18
**single** [4] - 33:12, 38:24, 59:11, 61:12
**sit** [2] - 50:21, 59:5
**sits** [1] - 51:1
**sitting** [1] - 51:8
**situation** [5] - 30:21, 31:1, 46:6, 46:14, 55:7
**six** [2] - 17:17, 59:10
**slightly** [2] - 13:10, 13:13
**software** [3] - 41:2, 43:8, 43:11
**sole** [1] - 40:2
**someone** [1] - 15:16
**somewhat** [2] - 27:25, 28:2
**Sorry** [2] - 8:20, 25:5
**sorry** [2] - 19:18, 53:24
**sort** [4] - 9:17, 15:5, 33:19, 40:12
**sounds** [1] - 34:6

**SPEAKER** [2] - 25:3, 66:15
**speaker** [16] - 46:1, 46:3, 46:7, 48:20, 48:23, 49:1, 49:6, 51:20, 51:24, 52:22, 53:25, 54:21, 55:5, 55:17, 59:7, 63:3
**speaker's** [9] - 47:1, 56:15, 56:19, 56:22, 57:3, 59:7, 62:2, 62:13, 62:25
**speaker-specific** [10] - 46:3, 46:7, 49:1, 49:6, 51:20, 51:24, 52:22, 54:21, 55:5, 55:17
**speaking** [2] - 8:21, 15:24
**speaks** [1] - 55:3
**specific** [15] - 16:10, 46:3, 46:7, 49:1, 49:6, 51:20, 51:24, 52:22, 53:25, 54:21, 55:5, 55:17, 57:3, 62:9, 62:10
**specifically** [1] - 16:6
**specified** [1] - 21:7
**Speech** [1] - 42:25
**speech** [74] - 4:23, 5:8, 5:11, 6:1, 6:14, 6:16, 6:17, 6:18, 6:19, 6:22, 6:25, 7:11, 7:19, 7:21, 7:22, 8:3, 9:24, 10:1, 10:18, 10:19, 11:4, 11:5, 11:12, 11:23, 12:1, 12:8, 12:9, 12:13, 12:17, 12:20, 13:6, 13:21, 13:23, 13:25, 14:1, 20:20, 20:24, 21:11, 21:20, 21:25, 22:2, 22:3, 22:20, 22:21, 23:7, 23:9, 24:1, 24:3, 37:14, 37:15, 47:1, 47:10, 47:15, 47:16, 49:5, 49:16, 49:19, 51:23, 56:15, 56:19, 56:22, 57:4, 57:5, 58:1, 58:4, 59:8, 62:2, 62:13, 62:25, 63:3, 63:10, 64:1, 64:7
**Speedbudget** [1] - 67:23
**ss** [1] - 67:2
**stage** [1] - 46:20
**stand** [1] - 7:25
**standard** [1] - 40:20

**standing** [1] - 34:12
**stark** [2] - 28:2, 28:5
**start** [3] - 13:11, 35:24, 48:13
**starting** [4] - 20:7, 33:24, 41:17, 42:10
**starts** [3] - 11:21, 14:11, 41:5
**state** [2] - 16:22, 64:20
**STATE** [1] - 67:2
**statement** [2] - 49:12, 49:14
**STATES** [1] - 1:1
**stay** [1] - 64:18
**Stenotype** [1] - 67:7
**step** [6] - 22:2, 57:14, 58:3, 58:9, 58:13, 60:21
**Step** [1] - 56:5
**Stephen** [3] - 3:9, 3:16, 25:4
**STEPHEN** [2] - 1:21, 2:7
**steps** [8] - 19:13, 33:24, 34:6, 34:11, 57:12, 57:19, 57:23, 58:8
**stern** [17] - 4:15, 7:14, 7:17, 8:7, 10:15, 11:9, 11:15, 13:15, 14:3, 14:7, 19:2, 19:17, 19:22, 24:10, 24:19, 46:10, 55:24
**Stern** [1] - 61:10
**Stern's** [2] - 5:15, 10:11
**Steven** [2] - 25:15, 27:2
**still** [16] - 7:25, 34:25, 48:11, 48:24, 49:7, 49:21, 51:6, 51:18, 52:20, 53:1, 53:15, 54:4, 54:19, 55:3, 55:16, 58:20
**Stop** [1] - 13:12
**stop** [6] - 6:12, 8:15, 13:12, 15:14, 47:2
**storage** [2] - 11:23, 12:22
**storing** [1] - 58:3
**strike** [11] - 3:23, 20:4, 45:9, 45:10, 48:3, 54:7, 54:9, 55:12, 61:3, 64:10, 64:12
**STRIKE** [3] - 1:9, 1:11, 67:16
**stronger** [1] - 49:3
**stuff** [2] - 14:1, 50:23
**subject** [3] - 40:8, 54:7, 55:11

**submit** [1] - 10:5
**submitted** [1] - 27:11
**subsequent** [6] - 40:3, 46:5, 56:5, 58:5, 58:7, 60:13
**substance** [2] - 28:6, 28:7
**sufficient** [2] - 17:7, 18:14
**suggest** [1] - 44:9
**suggesting** [2] - 7:6, 49:4
**suite** [1] - 33:12
**summarize** [1] - 20:10
**summarizes** [1] - 20:17
**summary** [14] - 3:24, 9:6, 9:13, 14:17, 16:14, 18:15, 18:24, 22:16, 24:23, 28:24, 31:16, 45:8, 51:13, 52:17
**supplemental** [1] - 60:10
**support** [2] - 32:9, 42:3
**supported** [1] - 35:13
**suppose** [2] - 35:8, 60:12
**supposed** [1] - 28:16
**surgical** [1] - 38:20
**surprised** [1] - 9:1
**system** [64] - 4:23, 6:2, 6:15, 6:18, 6:19, 6:23, 7:12, 9:25, 10:1, 10:18, 10:20, 11:4, 11:6, 11:13, 12:2, 12:3, 12:17, 12:21, 12:22, 12:24, 13:7, 13:22, 20:20, 21:12, 21:20, 21:21, 22:20, 22:22, 23:8, 23:10, 24:1, 25:11, 26:1, 27:15, 30:14, 30:23, 30:25, 31:2, 31:3, 31:6, 47:1, 47:11, 47:17, 48:19, 49:1, 49:22, 50:8, 55:3, 55:4, 55:16, 56:14, 56:19, 56:21, 57:4, 58:2, 58:6, 60:22, 61:11, 62:1, 62:12, 62:24, 63:9, 64:2
**systems** [2] - 32:21, 32:22

# T

**TARA** [1] - 2:6
**Tara** [1] - 3:16
**targeted** [1] - 18:5
**tax** [1] - 33:7
**teal** [5] - 25:12, 25:17, 31:5, 31:7, 31:13
**technology** [33] - 32:11, 32:18, 32:19, 33:11, 34:3, 35:19, 35:20, 36:3, 36:4, 36:5, 36:8, 36:9, 36:13, 36:17, 36:22, 37:1, 37:5, 37:11, 37:14, 37:15, 37:16, 37:17, 37:24, 38:5, 38:7, 39:14, 39:24, 41:25, 42:1, 42:4, 42:9, 44:3
**tee** [1] - 65:9
**Teel** [1] - 31:9
**teleconference** [2] - 1:13, 5:5
**term** [3] - 43:11, 61:24, 62:8
**terms** [3] - 24:19, 34:2, 38:9
**terse** [1] - 46:18
**testimony** [2] - 10:2, 28:20
**tethered** [1] - 42:11
**text** [1] - 22:5
**THE** [83] - 1:1, 1:2, 3:1, 3:10, 3:20, 6:12, 6:25, 8:15, 8:23, 10:9, 13:3, 13:12, 14:2, 15:14, 16:16, 17:2, 17:13, 17:19, 19:18, 20:5, 20:13, 21:10, 21:17, 22:7, 23:4, 23:16, 24:5, 24:9, 24:14, 25:6, 25:16, 25:25, 26:6, 26:23, 27:13, 29:3, 30:11, 32:2, 33:14, 34:13, 34:24, 35:14, 36:25, 39:6, 40:15, 47:4, 48:21, 50:10, 50:16, 51:10, 52:5, 52:13, 53:8, 53:17, 53:24, 54:10, 54:17, 55:10, 55:15, 56:9, 56:23, 58:16, 58:21, 59:16, 59:20, 59:24, 61:4, 61:21, 62:6, 62:14, 62:20, 63:1, 63:11, 63:16, 63:20, 63:23, 64:3, 64:9,

65:10, 65:25, 66:10, 66:17, 66:20
**theory** [1] - 46:23
**thereafter** [1] - 59:23
**therefore** [2] - 10:21, 13:7
**therein** [1] - 31:6
**thinks** [1] - 52:9
**third** [4] - 36:2, 41:6, 56:17, 59:14
**third-party** [1] - 36:2
**thousandth** [2] - 56:18, 59:14
**three** [5] - 21:15, 34:11, 52:24, 59:10, 60:2
**TO** [3] - 1:9, 1:11, 67:16
**today** [1] - 3:6
**took** [2] - 11:16, 29:11
**tossed** [1] - 28:13
**total** [1] - 37:16
**track** [1] - 19:6
**training** [1] - 50:22
**transcript** [2] - 67:12, 67:14
**TRANSCRIPT** [1] - 1:9
**trend** [1] - 38:13
**Tri** [1] - 16:22
**Tri-state** [1] - 16:22
**trial** [7] - 14:12, 30:10, 64:24, 64:25, 65:8, 65:13, 66:3
**trials** [1] - 65:15
**tried** [2] - 38:16, 48:4
**triple** [1] - 65:14
**troubling** [1] - 44:11
**true** [3] - 14:21, 35:5, 67:15
**try** [3] - 33:6, 39:18, 66:7
**trying** [10] - 7:8, 12:4, 12:18, 12:20, 13:1, 28:10, 45:19, 48:3, 50:13, 59:24
**Tuesday** [1] - 66:9
**turning** [1] - 22:4
**two** [15] - 12:2, 17:23, 19:3, 25:9, 33:23, 34:4, 36:11, 42:23, 44:7, 51:15, 52:18, 53:13, 54:5, 54:19, 65:15
**typed** [1] - 67:13
**types** [1] - 42:1
**typewritten** [1] - 67:15

# U

**U.S.D.C.J** [1] - 1:12
**ultimate** [1] - 44:1
**ultimately** [5] - 17:24, 18:12, 33:25, 41:14, 61:1
**unaffected** [2] - 53:1, 53:4
**under** [8] - 5:23, 41:16, 42:15, 48:15, 53:3, 54:6, 55:2, 62:15
**underlying** [2] - 32:6, 43:3
**understood** [3] - 7:2, 11:22, 19:9
**unequivocal** [1] - 23:15
**unfair** [8] - 14:18, 15:3, 16:4, 16:8, 16:21, 16:24, 18:17, 18:25
**unfollowable** [1] - 34:8
**UNIDENTIFIED** [2] - 25:3, 66:15
**UNITED** [1] - 1:1
**unless** [1] - 47:16
**unrelated** [1] - 33:2
**unreliable** [4] - 42:11, 42:19, 43:21, 44:15
**unreproducible** [1] - 34:5
**untethered** [1] - 43:22
**unwieldy** [1] - 65:4
**up** [27] - 14:7, 17:4, 20:6, 32:14, 33:5, 33:18, 34:9, 35:21, 36:18, 38:10, 38:14, 40:4, 40:7, 42:17, 43:17, 44:5, 51:3, 52:2, 57:20, 64:24, 65:9, 65:14, 65:20, 65:21, 66:3, 66:14
**upshot** [1] - 46:16
**upward** [5] - 38:13, 39:1, 41:13, 43:23
**user** [9] - 49:2, 50:9, 50:22, 51:20, 52:22, 55:3, 55:5, 57:18, 58:6
**uses** [3] - 57:2, 58:6, 61:13
**utilize** [1] - 46:13
**utterly** [1] - 46:9

## V

**valuation** [2] - 33:6, 33:8
**value** [8] - 17:5, 33:10, 36:3, 37:17, 37:21, 37:22, 43:18, 43:19
**valued** [1] - 32:22
**valuing** [4] - 32:17, 32:18, 36:22, 37:12
**various** [1] - 43:7
**via** [1] - 1:12
**view** [9] - 33:3, 40:5, 46:21, 50:4, 51:7, 56:7, 57:17, 58:5
**virtually** [1] - 38:12
**virtue** [1] - 33:1
**voice** [12] - 5:17, 5:25, 6:7, 12:7, 19:24, 20:20, 20:23, 22:1, 23:1, 23:10, 23:22, 63:25
**Voicenet** [2] - 42:25, 43:6
**vs** [2] - 1:5, 67:10

## W

**wait** [3] - 50:10, 62:6
**walk** [1] - 51:4
**walked** [1] - 17:24
**wants** [2] - 11:15, 58:24
**warner** [1] - 67:4
**Warner** [1] - 67:22
**Wasica** [3] - 27:24, 29:7, 29:10
**watkins** [1] - 3:15
**WATKINS** [1] - 2:5
**wave** [1] - 40:7
**waving** [2] - 33:19, 40:13
**week** [1] - 66:21
**Weil** [5] - 3:7, 14:23, 27:2, 35:23, 64:16
**WEIL** [1] - 1:19
**whatsoever** [2] - 29:15, 29:18
**WHEELER** [9] - 2:6, 8:18, 8:25, 11:8, 22:9, 23:13, 24:2, 24:8, 24:13
**Wheeler** [4] - 8:19, 12:15, 22:7, 23:4
**wheeler** [5] - 3:16, 8:21, 8:24, 15:16, 22:10
**whereas** [1] - 11:2

**whole** [3] - 32:19, 47:16, 57:15
**willful** [1] - 15:4
**winning** [1] - 53:25
**withdraw** [2] - 52:11, 53:12
**withdrawing** [1] - 54:22
**withdrawn** [2] - 52:14, 54:18
**witness** [1] - 15:11
**wizard** [1] - 50:20
**word** [3] - 36:17, 61:20
**words** [2] - 22:1, 57:6
**works** [1] - 31:3
**worse** [1] - 45:20
**worth** [1] - 39:10
**wrongful** [1] - 15:5
**wrongfully** [1] - 18:22

## Y

**year** [2] - 58:25, 59:10
**years** [7] - 41:9, 41:19, 59:10, 59:12, 60:2, 63:10